352 S.E.2d 73

**HAYSEEDS, INC.**

v.

**STATE FARM FIRE & CAS.**

No. 16782.

Supreme Court of Appeals of
West Virginia.

Dec. 12, 1986.

James R. Watson, Steptoe & Johnson, Charleston, for appellant.

Raymond H. Yackel, Oliver & Yackel, Morgantown, James M. Casey, Musgrave, Musgrave & Casey, Pt. Pleasant, for appellee.

NEELY, Justice.

This case involves a suit by a policyholder against an insurance company to recover the value of a burned building. We granted the appeal because we initially shared the defendant's anxiety that the jury's verdict might have been contrary to the evidence and to clarify our rules on attorneys' fees and punitive damages in property damage cases involving insurance companies. After examining the record we conclude that the jury's verdict for the insured was not erroneous on the underlying question of arson and that the award of consequential damages and attorneys' fees was proper. However, we reverse the award of punitive damages. Additionally, we find it appropriate here to refine and clarify our rules governing attorneys' fees, consequential damages and punitive damages in property damage insurance cases.

I

In August, 1980, James Trovato and Lynn Trovato bought a restaurant in Point Pleasant. The restaurant was located on a main thoroughfare of Point Pleasant in an old Kroger Store building of ten thousand square feet with ample parking. The building had already been converted to a family-style restaurant known as "Kinfolks" with a dining room, two banquet rooms, a kitchen and bath rooms.

Mr. and Mrs. Trovato paid $138,000 for the property, which included $100,000 payment to the original owners and the assumption of $38,000 in debts. Mr. and

Mrs. Trovato borrowed a total of $120,000 under two notes, one of which was secured by the furnishings, equipment, and interior of the restaurant and the other by Mr. Trovato's interest in a mobile home park in Monongalia County. Mr. Trovato had had three years of experience in running a successful restaurant in Morgantown and both he and his wife believed that the purchase of Kinfolks (later Hayseeds) was a good investment.

Before opening the restaurant, Mr. and Mrs. Trovato spent approximately $20,000 on improvements. They purchased an insurance policy for fire loss and protection from Paul Summerville, a State Farm agent in Point Pleasant, who was also a member of the board of directors of the People's Bank of Point Pleasant where the Trovatos had taken out their loans. Mr. Summerville recommended a policy amount of $150,000 and Mr. and Mrs. Trovato purchased a policy with that coverage for an annual premium of $3,344.

When the restaurant first opened in August, 1980, both Mr. and Mrs. Trovato devoted approximately 12 hours a day, six to seven days a week to the restaurant. Although business was not what they had originally anticipated, the restaurant improved steadily beginning in January, 1981. In March, 1981, Mr. and Mrs. Trovato purchased some video games and opened a video game room in their restaurant building. Eventually they purchased more video games and placed them in outside locations. At this time the video game market was at its peak and Mr. Trovato began devoting an increasing portion of his time to the game business rather than the restaurant.

However, in October, 1981, Hayseeds closed its doors to the public because Mrs. Trovato was pregnant and had medical complications that prompted her doctor to advise her to stop working. Mrs. Trovato had been working between 50 and 70 hours per week in the restaurant as its manager, and when she had to stop working the cost of hiring a substitute manager made it uneconomical to continue operations. Furthermore, Mr. Trovato had become com-

pletely engrossed in the video game business and he concluded that the highest and best use of his time was in that enterprise rather than the restaurant business. After Hayseeds closed, Mr. Trovato used the building as a warehouse and office for his video game business. The building was being used for that purpose when, at approximately 2:30 a.m. on 14 April 1982 the building burned down.

The fire, which caused extensive damage to the interior of the restaurant, was investigated by the State Fire Marshal. State Farm received its first notice of the blaze from Hayseeds' insurance agent, Paul Summerville, of Point Pleasant, who stopped at the fire scene on the morning of the fire. Mr. Summerville told State Farm that Hayseeds had been closed for a couple of months and that its equipment was for sale. He further advised State Farm that the property had been advertised for sale in the Huntington newspaper, and that the insured was now in the video game business and had financial problems. State Farm then initiated an investigation to determine whether the building had been burned by the insureds. There was no question at trial that the fire had been deliberately set by an arsonist, and that was the official report of the State Fire Marshal.

When Mr. and Mrs. Trovato filed their claim for property damage with State Farm, State Farm declined to pay on the grounds of arson. Mr. and Mrs. Trovato then brought this action in the Circuit Court of Mason County and, after a lengthy trial, the jury returned a verdict for $150,000 on the insurance policy itself, $69,000 for attorneys' fees and consequential damages and $50,000 for punitive damages. State Farm's assignments of error are that: (1) the overwhelming weight of the evidence favored its position; (2) the trial court should not have instructed the jury that State Farm had the burden of proving its arson defense by clear and convincing evidence; and, (3) the evidence demonstrated that State Farm had more than a reasonable ground for denying the insured's claim and, therefore, should not be liable for punitive damages.

State Farm's position has always been that the circumstantial evidence in this case ineluctably leads any fair-minded person to the conclusion that Mr. and Mrs. Trovato (or one of them) caused the building to be burned. State Farm points to the fact that: (1) the Trovatos had significant financial problems; (2) the mortgage payments were a serious drain on their limited resources; (3) the fire was caused by arson; and (4) the building was locked when the fire was started.

On the other hand, Mr. and Mrs. Trovato have taken the position that their financial problems were similar to those of many small business owners and that their circumstances alone could not lead to the conclusion that they had committed a felony. Buildings are burned down by pyromaniacs, personal enemies, juveniles, and miscellaneous crackpots all the time. The fact that a fire is deliberately set does not necessarily imply that it was set by the owner. At trial State Farm relied entirely on circumstantial evidence. Mr. and Mrs. Trovato, on the other hand, took the stand and testified under oath that they had neither burned the building themselves nor caused someone else to burn it.

Mr. and Mrs. Trovato's claim for punitive damages and attorneys' fees proceeded from their allegations that State Farm failed to make a fair, good faith investigation of the facts and circumstances surrounding the fire. They proved to the jury's satisfaction that the investigation focused only upon circumstances that could justify denial of the claim. In this regard the most serious contention of the plaintiffs was that State Farm failed to make a careful investigation of the plaintiffs' financial condition. Plaintiffs argued that, although the destroyed building was a drain on plaintiffs' income, they were keeping their heads above water and did not need to burn the building.

The record bears out that the plaintiffs authorized State Farm to contact the plaintiffs' accountant, who had access to all plaintiffs' financial information including bank accounts, loans, loan payments, receipts from the video game business, receipts from Hayseeds, receipts from Mundy's (another of plaintiffs' restaurants) receipts from Frontier Bakery in Morgantown (which plaintiffs also owned), tax returns, bank statements, accounting information, personal notes, scrap sheets and other accounting information. Although State Farm admitted that they were authorized to review this information, State Farm conceded that they did not undertake a complete examination of plaintiff's financial condition.

## II

■ This is admittedly a close case, but upon a full review of the transcript we are persuaded that there was sufficient evidence that the jury could infer that Mr. and Mrs. Trovato were not at fault in the burning of the building. Furthermore, this is not the type of case where a jury's sympathy is automatically with the plaintiff. Had State Farm proven arson, there is little reason to believe that a local jury would have condoned that common law felony and rewarded the plaintiffs' with punitive damages. Consequently, there is every reason in this case to apply the ancient rule that on appeal of a jury verdict the evidence will be construed most strictly in favor of the prevailing party below. Viewed that way, the evidence in this case is sufficient to support the verdict. *See, e.g., Butcher v. Stoll,* 140 W.Va. 31, 82 S.E.2d 278 (1954); *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1983).

State Farm contends, however, that the jury would not have returned such a verdict had they not been given Plaintiff's Instruction Number 2, which read as follows:

> While such proof of such a defense involves proof of a crime, arson, this is not a criminal case but a civil action upon a fire insurance policy. Therefore, State Farm need not prove beyond a reasonable doubt that the plaintiff voluntarily and intentionally burned their business. Such proof need only be by a preponderance of the evidence. However, such proof of voluntary and intentional burning should be clear and satisfactory, tak-

ing into consideration the presumption of innocence in such cases, which the evidence must be sufficient to overcome, and must do more than establish a basis for mere suspicion, speculation or conjecture. Where circumstantial evidence is relied on by State Farm, such evidence must be such as does more than throw a mere suspicion of guilt on the plaintiff, and the inference or presumption to which the facts give rise must be strong and almost inevitable. If the circumstances are such as to be fairly susceptible of two constructions, the one that frees the plaintiff from the imputation of fraud may be accepted.

 State Farm specifically complains about the use of the terms "clear and satisfactory," "presumption of innocence," and "almost inevitable." We recognize that this was by no means a model instruction. *See Morgan v. Ins. Co. of North America,* 146 W.Va. 868, 122 S.E.2d 838 (1961). Nonetheless, given the peculiar nature of the decisional law governing affirmative defenses to actions on insurance contracts, this instruction states the law with sufficient accuracy, under the facts of this case, that there is no reversible error. *See Karr v. Baltimore & O.R. Co.,* 76 W.Va. 526, 86 S.E. 43 (1915); *Bourne v. Richardson,* 133 Va. 441, 113 S.E. 893 (1922).

In *Virginia Fire & Marine Ins. Co. v. Hogue,* 105 Va. 355, 54 S.E. 8 (1906) our colleagues on the Supreme Court of Virginia held:

"In a case, as in this, where the defense made to the action involves the charge of an unlawful act, fraud, or even bad faith, a preponderance of the evidence, as in any other civil case, is sufficient to sustain the charge, provided the proof is clear and strong enough to preponderate over the general and reasonable presumption that men are honest and do not ordinarily commit fraud, or act in bad faith; i.e., the preponderance rule continues to operate in such cases, the adverse presumption in favor of honesty and fair dealing merely requiring more evidence to constitute a preponder-

ance than where this presumption does not exist.

"We are of the opinion, therefore, that 'clear and satisfactory', in cases involving fraud or false swearing, may be defined to be a preponderance of evidence sufficient to overcome the presumption of innocence of moral turpitude or crime ..."

*See also Mize v. Harford Ins. Co.,* 567 F.Supp. 550 (W.D.Va.1982); *Carpenter v. Union Insurance Society of Canton, Ltd.,* 284 F.2d 155 (4th Cir.1960); *Kisting v. Westchester Fire Ins. Co.,* 290 F.Supp. 141 (W.D.Wisc.1968), *affd.* 416 F.2d 967 (7th Cir.1969); *DiMartino v. Continental Ins. Co. of New York,* 187 La. 855, 175 So. 598 (1937); *Sumrall v. Providence Washington Ins. Co.,* 221 La. 633, 60 So.2d 68 (1952); *Metropolitan Life Ins. Co. v. Stuckey,* 194 S.C. 469, 10 S.E.2d 3 (1940); *Hope v. South Texas Lloyds,* 171 So.2d 837 (1965), *writ ref.* 247 La. 677, 173 So.2d 541 (1965); *Ziegler v. Hustisford Farmers Mut. Ins. Co.,* 238 Wis. 238, 298 N.W. 610 (1941).

### III

We now consider the award of consequential damages, including litigation expenses. Initially, it is important to observe that insurance contracts are qualitatively different from other contracts. Not only do policyholders rely upon insurance policies, but a host of third-party creditors rely upon those policies as well. Furthermore, the bargaining power of an insurance carrier *vis-a-vis* the bargaining power of the policyholder is disparate in the extreme. When a policyholder's property has been destroyed—whether it be a private house or a business structure—there is an urgent need to rebuild immediately. In the case of a business, lack of immediate rebuilding may cost the company a significant portion of its skilled employees and may cause employees the loss of their jobs, pensions, and seniority. Although in the case before us it is unlikely that the burned structure will be rebuilt, nonetheless, creditors must be paid and capital must be recouped for other business ventures.

There is no question that insureds do burn their own buildings from time to time and that other types of fraudulent claims are made with some regularity; and we are not unmindful that the dismal economic conditions in West Virginia today make arson an attractive expedient to more and more desperate people. Certainly it is not to the benefit of policyholders as a class for insurance companies to pay fraudulent claims. When an insurance company has reasonable grounds to believe that a claim is fraudulent in whole or in part, it is perfectly appropriate for the company to ask a court to decide the issue of the claim's legitimacy.

Unfortunately, in the business of claims settlement we do not have simply two parties—the company that wishes to pay the lowest legitimate amount of money and the policyholder who wants maximum benefits under the policy. Between these two profit-maximizing, rational players, there is an entire corporate bureaucracy composed of agents, administrators, corporate counsel, and local litigating lawyers. This bureaucracy is neither inherently good nor inherently evil, and it performs a necessary function in the insurance industry. Nonetheless, the claims settlement bureaucracy is subject to the same dynamics as every other bureaucracy known to man: its natural tendency is to maximize upward mobility for middle management members of the bureaucracy and to augment the work that the bureaucracy is responsible for doing. In government, this phenomenon is often referred to as "turf protection." The extent to which pernicious dynamics prevail in any particular company's claims bureaucracy differs from company to company and from office to office within the same company. However, a policyholder who runs into an intransigent or unreasonable claims settlement bureaucracy is destined to be sorely put upon.

Although the disparity of bargaining power between company and policyholder (often exacerbated by the dynamics of the settlement bureaucracy) make insurance contracts substantially different from other commercial contracts, efforts to provide greater balance have been halting at best, and have often depended upon fictions such as lack of "good faith" to circumvent general prohibitions against fee-shifting. The unstructured and nebulous nature of the rules concerning good faith settlement of policy claims in property damage cases is directly related to the American rule that both sides of a civil controversy must pay their own attorneys' fees—win, lose, or draw. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In many social contexts this rule makes eminently good sense; among other things, it makes it uneconomical for creditors to hound insolvent debtors with relentless severity, and it makes it possible for injured victims to sue well financed tort-feasors without fear of resulting personal bankruptcy should they lose.[1] However, the fact that the general rule concerning fees works well *most* of the time does not necessarily imply that the rule works well *all* of the time. Indeed, at last count there were over fifty fee-shifting statutes in the *United States Code* alone. We find property damage cases between policyholders and insurers to be one of the prominent instances where the American rule concerning attorneys' fees works badly.

In keeping with the American rule, it is generally held that, in the absence of a statutory or contractual provision providing for such recovery, attorneys' fees may not be recovered in an action on an insurance policy. *See* 22A J. Appleman, *Insurance Law and Practice,* § 14533 (Appleman ed. 1979) and cases there cited; 15A *Couch on Insurance* 2d § 58:124 (Rhodes ed. 1983) and cases there cited. In response to the American rule, however, numerous state legislatures have enacted statutes entitling prevailing claimants to attorneys' fees when the insurer refuses to settle a claim without just cause. *See* 15A *Couch on Insurance* 2d, *supra,* § 58:2 and statutes there cited; 15A *Couch on Insurance* 2d, *supra,* § 58:123 and cases there cited; 22A J. Appleman, *Insurance Law*

---

1. *See* R. Neely, *Why Courts Don't Work,* McGraw Hill (New York, 1982) pp. 175–186.

*and Practice, supra,* § 14532 and cases there cited. These statutes have often been so expressed as to make an award of fees to the successful claimant *automatic. See Unionaid Life Ins. Co. v. Bank of Dover,* 192 Ark. 123, 90 S.W.2d 982 (1936); *Akins v. Illinois Bankers Life Assur. Co.,* 166 Kan. 648, 203 P.2d 180 (1949); *Hawkeye Cas. Co. v. Stoker,* 154 Neb. 466, 48 N.W.2d 623 (1951). Moreover, several courts have held that, even in the absence of a statutory or contractual provision, attorneys' fees may be awarded to the claimant when the insurer has acted in bad faith, wantonly, or for an oppressive reason. *See Montgomery Ward & Co., Inc. v. Pacific Indemnity Co.,* 557 F.2d 51 (3rd Cir.1977); *Christian v. American Home Assur. Co.,* 577 P.2d 899 (Okla.1977); *Mustachio. v. Ohio Farmers Ins. Co.,* 44 Cal.App.3d 358, 118 Cal.Rptr. 581 (1975).

Thus it appears that there is a recognition in a substantial number of American jurisdictions of the role of attorneys' fee awards in encouraging the prompt payment of valid claims. *See Meeks v. State Farm Mutual Automobile Ins. Co.,* 460 F.2d 776 (5th Cir.1972); *Universal Underwriters Ins. Co. v. Gorgei Enterprises, Inc.,* 345 So.2d 412 (Fla.App.1977). As early as 1982 we recognized in principle the propriety of awarding attorney's fees to prevailing claimants in property damage insurance cases. *Nelson v. West Virginia Public Employees Ins. Board,* 171 W.Va. 445, 300 S.E.2d 86, 95–96 (Neely, J., concurring). We remain convinced that this is the proper rule, and thus reaffirm it today.

In *Aetna Casualty & Surety Co. v. Pitrolo,* 176 W.Va. 190, 342 S.E.2d 156 (1986), we held in Syllabus Point 2:

Where a declaratory judgment action is filed to determine whether an insurer has a duty to defend its insured under its policy, if the insurer is found to have such a duty, its insured is entitled to recover reasonable attorney's fees arising from the declaratory judgment litigation.

We adopted this rule in recognition of the fact that, when an insured purchases a contract of insurance, he buys insurance— not a lot of vexatious, time-consuming, expensive litigation with his insurer. As our opinion noted:

Where an insurer has violated its contractual obligation to defend its insured, the insured should be fully compensated for all expenses incurred as a result of the insurer's breach of contract, including those expenses incurred in a declaratory judgment action. To hold otherwise would be unfair to the insured, who originally purchased the insurance policy to be protected from incurring attorney's fees and expenses arising from litigation.

176 W.Va. 194, 342 S.E.2d at 160.

Perhaps due to the "bad faith" exception to the "American rule" governing awards of attorneys' fees, the parties devote considerable argument in this case to the issue of whether State Farm's refusal to pay was in "good faith" or "bad faith." As Justice Miller noted in *Aetna, supra,* "whether an insurer's refusal to defend was in good or bad faith is largely irrelevant once it has been established that the insurer breached its contract with its insured." 176 W.Va. at 194–95, 342 S.E.2d at 160. As stated in 7C J. Appleman, *Insurance Law and Practice,* § 4691 (Berdal ed. 1979):

After all, the insurer had contracted to defend the insured, and it failed to do so. It guessed wrong as to its duty, and should be compelled to bear the consequences thereof.

*Id.* 140 W.Va. at 36–39, 82 S.E.2d at 282–83. Similarly, we consider it of little importance whether an insurer contests an insured's claim in good or bad faith. In either case, the insured is out his consequential damages and attorney's fees. To impose upon the insured the cost of compelling his insurer to honor its contractual obligation is effectively to deny him the benefit of his bargain.

Accordingly, we hold today that whenever a policyholder must sue his own insurance company over any property damage claim, and the policyholder substantially prevails in the action, the company is liable for the payment of the policyholder's reasonable attorneys' fees. Presumptively, reasonable attorneys' fees in this type of case are one-third of the face amount of

the policy, unless the policy is either extremely small or enormously large. This follows from the contingent nature of most representation of this sort and the fact that the standard contingent fee is 33 percent. But when a claim is for under $20,000 or for over $1,000,000 (to take numbers that are applicable in 1986) the court should then inquire concerning what "reasonable attorneys' fees" are.

■ It is now the majority rule in American courts that when an insurer wrongfully withholds or unreasonably delays payment of an insured's claim, the insurer is liable for all forseeable, consequential damages naturally flowing from the delay. *See* Annot. 47 A.L.R.3d 314 (1973). Unfortunately, awards of consequential damages currently turn on judicial interpretation of such malleable and easily manipulated concepts as "reasonable," "unreasonable," "wrongful," "good faith" and "bad faith." We believe that the interests of both the parties and the judicial system would be better served by the enunciation of a clear, bright line standard governing the availability of consequential damages in property damages insurance cases. Accordingly, we hold today that when a policyholder substantially prevails in a property damage suit against an insurer, the policyholder is entitled to damages for net economic loss caused by the delay in settlement, as well as an award for aggravation and inconvenience.

However, in allowing an award for aggravation and inconvenience, we do not intend that punitive damages be awarded under another sobriquet. For example, a large corporation with an in-place, organized collective intelligence that must litigate a claim for several years may suffer substantial net economic loss but little aggravation and inconvenience. On the other hand, a family of five that is required to live for four years in a trailer because an insurance company has declined to pay the fire policy on their $200,000 house suffers little net economic loss but an enormous degree of aggravation and inconvenience. *See Jarrett v. E.L. Harper & Son, Inc.,* 160 W.Va. 399, 405, 235 S.E.2d 362, 366 (1977) (Neely, J., concurring). One major advantage of this rule is that it encourages a quick trial. In West Virginia there is little reason that property damage claims cannot be tried by a jury in less than six months if both sides cooperate.

IV

■ We now consider the award of punitive damages. Generally, punitive damages are unavailable in an action for breach of contract unless the conduct of the defendant constitutes an independent, intentional tort. *Warden v. Bank of Mingo,* 176 W.Va. 60, 341 S.E.2d 679 (1985); *Hurxthal v. St. Lawrence Boom & Lumber Co.,* 53 W.Va. 87, 44 S.E. 520 (1903); *Horn v. Bowen,* 136 W.Va. 465, 67 S.E.2d 737 (1951); *Short v. Grange Mutual Casualty Co.,* 307 F.Supp. 768 (S.D.W.Va.1969); *Cotton v. Otis Elevator Co.,* 627 F.Supp. 519 (S.D.W.Va.1986). Accordingly, it is almost universally held that an insurer is not liable for punitive damages by its refusal to pay on a claim unless such refusal is accompanied by a malicious intention to injure or defraud. *See* Annot. 47 A.L.R.3d 314 (1973). We believe this is the better rule, and we clearly announce it today.

■ Accordingly, punitive damages for failure to settle a property dispute shall not be awarded against an insurance company unless the policyholder can establish a high threshold of actual malice in the settlement process. By "actual malice" we mean that the company actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally denied the claim.[2] We intend this to be a

---

2. One example of "actual malice" would be a company-wide policy of delaying the payment of just claims through barraging the policyholder with mindless paperwork. For example, in a claim for household contents in a burned out house, the company should simply pay the face amount of the policy. Since the companies themselves often *require* a certain level of insurance on contents, it shows actual malice to require the policyholder to fill out form after form and argue for months over what, in nearly every case, is a foregone conclusion. Here the actual malice is a desire to keep millions of dollars in claims money at interest within the

bright line standard, highly susceptible to summary judgment for the defendant, such as exists in the law of libel and slander, or the West Virginia law of commercial arbitration. *See, e.g., N.Y. Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Board of Education v. Miller,* 160 W.Va. 473, 236 S.E.2d 439 (1977). Unless the policyholder is able to introduce evidence of intentional injury—not negligence, lack of judgment, incompetence, or bureaucratic confusion—the issue of punitive damages should not be submitted to the jury. Furthermore, a willingness to settle a case of alleged arson can no longer be used as evidence of "bad faith" because the concept of "bad faith" short of actual malice no longer has any place in the law of property damage insurance cases. In fact, to make the matter entirely explicit, an offer of settlement can never be used to show "actual malice" nor be used against an insurance carrier in any way.

■ We do not believe that the plaintiffs presented sufficient evidence of malicious intent to injure or defraud to justify the punitive damages awarded below. Although there was some evidence that the company began its investigation with a preconceived disposition to deny the claim, that disposition did not rise to the level of malice that we have just articulated. Accordingly, we reverse the award of punitive damages granted below.

Our reading of the cases throughout the United States on bad faith settlement leads us to conclude that the result that we have just articulated concerning attorneys' fees and damages for economic loss and inconvenience are what many other courts have been trying to achieve by indirect means. But by achieving these desirable results through the *ad hoc* manipulation of highly subjective criteria, the rules have become unpredictable and confusing. Voluntary settlements (which are in everyone's interest) are best encouraged by the articulation of clear, concise, bright line rules.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Mason County is reversed in part and affirmed in part, and the case is remanded to the circuit court for entry of an appropriate order.

Affirmed.

company. But the same reasoning, of course, would not apply to the fluctuating inventory of an insured warehouse or any other situation where it is reasonable to assume that the value of the insured property—contents of a jewelry store, for example—will fluctuate seasonally and the annual premium has been calculated accordingly.