**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-1459**

───────────

RAMACO RESOURCES, LLC,

        Plaintiff - Appellant,

v.

FEDERAL INSURANCE COMPANY; ACE AMERICAN INSURANCE COMPANY,

        Defendants - Appellees,

and

CHUBB INA HOLDINGS INC.,

        Defendant.

───────────

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  John T. Copenhaver, Jr., Senior District Judge.  (2:19-cv-00703)

───────────

Argued:  January 27, 2023                      Decided:  July 20, 2023

───────────

Before WYNN, THACKER, and RICHARDSON, Circuit Judges.

───────────

Reversed in part, affirmed in part, and remanded by published opinion.  Judge Richardson wrote the opinion, in which Judge Wynn and Judge Thacker joined.

───────────

**ARGUED:**  Elbert Lin, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Appellant.  Jonathan D. Hacker, O'MELVENY & MYERS LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  Evan H. Jenkins, JENKINS FENSTERMAKER, PLLC,

Huntington, West Virginia; Robert M. Rolfe, David M. Parker, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellant. Matthew Ponzi, John Eggum, FORAN GLENNON, Chicago, Illinois; Heather Welles, O'MELVENY & MYERS LLP, Los Angeles, California, for Appellees.

RICHARDSON, Circuit Judge:

This is a dispute between a coal company and its insurer. Ramaco Resources suffered a coal silo collapse and submitted a claim for losses to Federal Insurance Company. When Federal denied the claim, Ramaco sued. After a twelve-day trial, a jury awarded Ramaco $7.6 million in contract damages and prejudgment interest. The jury also awarded $25 million under West Virginia's *Hayseeds* doctrine, which permits an insured party to claim consequential damages when it prevails after suing to collect on its insurance policy. But post-trial, the district court reduced Ramaco's contract damages and interest to $1.8 million and entirely rejected the *Hayseeds* damages as a matter of state law. The district court also conditionally granted a new trial on the *Hayseeds* award, reasoning that—even if *Hayseeds* damages were theoretically permissible—the jury's $25 million award was punitive, and thus invalid. Ramaco appealed, and we reverse in part and affirm in part. We reverse the district court's reduction of contract damages and prejudgment interest because the insurance policy's plain language and the trial evidence support the jury's original $7.6 million award. And we reverse the district court's wholesale rejection of *Hayseeds* damages. But we affirm its conditional grant of a new *Hayseeds* damages trial as the district court reasonably concluded that the amount awarded was punitive.

## I.    Background

Ramaco mines and processes coal in Logan County, West Virginia. Mined coal is trucked to a nearby processing facility. There, the coal first passes through a "scalping building" for initial sorting and processing. It is then fed by conveyer belt into three concrete silos. These silos serve as bulk storage and allow a consistent, steady flow of coal

3

into a preparation plant.  Each silo uses a large metal hopper to regulate the coal flow onto another conveyer belt running below the silos.  That second conveyer belt takes coal from all three silos to the preparation plant, where it is processed and cleaned.

On November 5, 2018, the hopper in Silo 1 collapsed.  The collapse damaged Silo 1's concrete wall and the conveyer belt under the silos, completely shutting down Ramaco's operations.  Ramaco immediately filed an insurance claim with Federal.  The engineer that Ramaco used to inspect the collapse recommended that Ramaco demolish Silo 1.  The engineer also recommended installing steel supports underneath the hoppers in Silos 2 and 3 to prevent similar collapses.  Ramaco adopted the engineer's recommendations and demolished Silo 1.  It also rigged a temporary bypass belt using parts of the belt underneath Silos 2 and 3 so it could partially resume operations on November 30, 2018.

But the temporary bypass belt was not a perfect fix.  It was less efficient, so Ramaco had to run the preparation plant overtime to produce the same amount of marketable coal. And, because it took longer to process the raw coal from the mine, Ramaco also had to create coal stockpiles, increasing the manpower needed to process it.  To improve operations, Ramaco designed and built a permanent bypass belt.  It began operating the permanent bypass belt on March 3, 2019.

While Ramaco was operating the temporary bypass belt, Federal was investigating Ramaco's coverage claim.  Federal denied the claim in January 2019.  It concluded that the hopper collapse in Silo 1 was caused by corrosion, which was not covered by the policy. Ramaco thought that corrosion in Silo 1 was unlikely, so it requested that Federal conduct

4

another investigation.[1]  Yet, after more investigation, Federal again denied Ramaco's claim in August 2019.

Believing that it was entitled to coverage, Ramaco sued Federal.[2]  Ramaco sought two types of damages.  First, it sought contract damages under the policy for its lost business income and extra expenses incurred.  Second, it sought damages under West Virginia's *Hayseeds* doctrine, which allows an additional recovery for an insured party who "substantially prevails" in a suit against their insurer.  *See generally Hayseeds, Inc. v. State Farm Fire & Cas.,* 352 S.E.2d 73 (W. Va. 1986).  The trial was bifurcated for the two types of damages.  Phase One, which lasted eleven days, established liability and damages under the policy.  The jury held for Ramaco, concluding that the policy covered Silo 1's collapse.  It awarded $7.1 million in contract damages and $500,000 in prejudgment interest, for a total award of $7.6 million.  Phase Two addressed *Hayseeds* damages.  There, the jury awarded Ramaco $25 million in aggravation and inconvenience damages.

After trial, the district court reduced the contract damages and vacated the *Hayseeds* damages.  During the contract-damages trial, the court had initially allowed Ramaco to

---

[1] At trial, Ramaco's theory was that a "coal arch" in Silo 1 caused its collapse.  A coal arch is essentially a clog that forms when coal sticks together and blocks egress from a silo.  Coal below the arch can drain onto the conveyer belt, but coal above the arch cannot, creating a cavity in the silo.  Ramaco alleged that such an arch formed in Silo 1, that the arch eventually broke apart, and that the falling mass caused the hopper's collapse.  Coal arches, Ramaco said, were covered by the policy.

[2] Ramaco also sued Federal's affiliate, Ace Insurance Co., but we refer to the defendants collectively as Federal.

present evidence of damages through March 3, 2019. But, after the trial, the court changed its mind and held as a matter of law that the period of restoration—the period during which Ramaco could recover contract damages—ended on November 30, 2018. Shortening that period meant that Ramaco was only entitled to $1.6 million in contract damages, for a total of $1.8 million after including prejudgment interest. In turn, this reduction meant that Ramaco did not substantially prevail and was thus no longer entitled to *Hayseeds* damages, so the court vacated the jury's $25 million *Hayseeds* award. The court also conditionally ruled that, even if the jury's original $7.6 million award was reinstated on appeal, Federal would still be entitled to a new trial on *Hayseeds* damages because the jury's $25 million award was punitive and excessive. Ramaco appealed, and we have jurisdiction. *See* 28 U.S.C. § 1291.

## II.      Discussion

Ramaco argues that the district court should not have disturbed either set of damages. First, it argues that the district court misinterpreted the insurance policy when it held as a matter of law that the policy's "period of restoration" ended on November 30. We agree. Under the jury's instructions, which properly described the insurance policy, the jury could reasonably have concluded that the "period of restoration" lasted at least until March 2019. So we must reinstate the jury's original $7.6 million award in contract damages and prejudgment interest. Once we do so, Ramaco argues that we must also reinstate the $25 million *Hayseeds* award. We disagree. While Ramaco is entitled to *Hayseeds* damages, the district court properly held that a new trial is necessary to calculate them.

6

## A.      The jury properly awarded contract damages

We begin with the district court's reduction of contract damages and prejudgment interest from $7.6 million to $1.8 million. The district court reduced the jury's award because it concluded that the contractual "period of restoration"[3] ended on November 30, 2018, when Ramaco's throughput of coal[4] returned to pre-collapse levels. Reviewing this legal conclusion de novo, we conclude that the district court misread how the policy defines the "period of restoration." Normally such an error would require that we remand. Here, though, we need not. The district court properly instructed the jury on how to determine the period of restoration. The court's misreading only occurred post-trial when it changed course and entered judgment as a matter of law, reducing the jury's award. Based on the evidence presented, the jury reasonably concluded that the period of restoration lasted well beyond November 30. So we need only reinstate the jury's award.[5]

---

[3] Under the policy, Ramaco is entitled to damages incurred throughout the period of restoration. There's no question that the period began when the hopper collapsed: November 5, 2018. But when the period ended was a question for the jury.

[4] Throughput is the amount of coal passing through the preparation plant.

[5] On this point, Ramaco tries to have its cake and eat it too. It disputes an evidentiary ruling that barred it from submitting evidence of losses after March 3, 2019. So it wants a limited remand to show the jury evidence of loss between March and June 2019. But it only wants that remand if we lock in the $7.6 million award for damages accrued through March. In other words, it does not want a retrial if it also must re-litigate pre-March damages.

We will not order the partial retrial that Ramaco requests. A partial retrial is only appropriate if "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931); *see also Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 290 (4th Cir. 2000). Ramaco has not made this showing.

7

The district court held that "the policy measures the end of the period of restoration in throughput of coal." J.A. 273. In other words, it said the period of restoration ended when Ramaco's coal throughput levels reached where they would have been without the collapse. Throughput caught up in November. So, the district court reasoned, the period of restoration ended in November as well.

But the district court used the wrong indicator for the end of the period of restoration. Because we are sitting in diversity, we must interpret the policy as the West Virginia Supreme Court of Appeals would. *See Whitmire v. S. Farm Bureau Life Ins. Co.*, 52 F. 4th 153, 157 (4th Cir. 2022). And, in West Virginia, courts give insurance policies their "plain, ordinary meaning." Syl. Pt. 2, *Chafin ex rel. Est. of Bradley v. Farmers & Mechs. Mut. Ins. Co.*, 751 S.E.2d 765, 766 (W. Va. 2013). The policy's plain language does not condition the period of restoration solely upon coal throughput.

The policy states that the "[p]eriod of restoration will continue until your operations are restored, with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage occurred." J.A. 595. And the policy defines "business income" as "net profit or loss." J.A. 567. So the policy's plain language ties the period of restoration to Ramaco's net profits. It says that the period ends when operations are restored to the level which would generate the net profits that would have existed if the collapse had not occurred.

Put differently, the period of restoration ends when Ramaco reaches a certain level of operations. That level is determined by asking a counterfactual question: What would

8

Ramaco's net profits be but for the collapse?  Once Ramaco reaches the level of operations that would generate these net profits, the period of restoration has ended.

In a simplified sense, Ramaco's net profits depend on three things:  the price of coal, output, and costs.  *See Net Profit,* Black's Law Dictionary (11th ed. 2019) ("Total sales revenue less the cost of the goods sold and all additional expenses.").  Coal's price is set by the market and appears unaffected by the collapse or Ramaco's actions.  So, after suffering a collapse, Ramaco's ability to return to pre-collapse net profits[6] depends on both (1) how much coal it can process, and (2) how much it costs to process that coal.  If Ramaco's processing costs stay the same, then it is true that it would only need to return to its pre-collapse throughput of coal.  But if the collapse causes Ramaco's processing costs to go up, then Ramaco would not return to its pre-collapse net profits unless it also processes more coal (or cuts costs).  Either way, determining when the period of restoration ends requires us to consider both throughput and cost.  Looking at throughput alone—like the district court did—isn't enough.

A concrete hypothetical example makes this clear.  Assume the price of coal remains at a constant $100 per short ton.  Before the collapse, imagine that Ramaco produced 50,000 short tons at a cost of $80 per ton.  Without the collapse, Ramaco would have

---

[6] Technically, as discussed above, the period of restoration does not hinge on Ramaco's ability to return to its actual "pre-collapse" net profits, but instead the hypothetical net profits "that would have existed if no [collapse] occurred." J.A. 595. Because the price of coal can fluctuate, these two values might not always be the same thing. But, because coal's price appears unrelated to Ramaco's collapse, we will hold it constant for illustrating our point: that calculating net profits requires considering both throughput and costs.

9

continued to produce 50,000 tons at the same cost of $80 per ton for a net profit of $1,000,000 (50,000 tons x $20 profit per ton). After the hopper collapse, imagine that Ramaco's throughput quickly returned to 50,000 tons of coal. But it achieved this only by spending more on labor, so its cost to produce each ton was $85 instead of $80. Ramaco's net profits would then be $750,000 (50,000 tons x $15 profit per ton), or $250,000 less than in our no-collapse counterfactual. To produce the same net profits as would have existed without the collapse ($1,000,000), Ramaco would have to increase its level of operations to 66,666 tons of coal at its cost of $85 per ton (66,666 tons x $15 profit per ton). If instead Ramaco could reduce its costs, then the level of operations needed to generate the counterfactual net profits would decrease. So a court needs to consider both throughput and costs before it can identify the end of the restoration period.

Yet the district court focused only on coal throughput. Throughput is, at best, a measure of total revenue. But it does not account for costs and expenses eating into that revenue. It therefore does not approximate net profits. The level of throughput that Ramaco needed to generate the net profits that it would have made but for the collapse depends on the corresponding costs. The higher the increased costs resulting from the collapse, the higher the throughput that Ramaco needed to generate those net profits. The district court was therefore wrong to determine the end of the restoration period by looking solely at coal throughput.

Luckily, the district court provided the jury with the correct standard. The court read the policy's definitions of the period of restoration and business income during the jury instructions. And, as discussed, the policy tied the end of the period of restoration to

Ramaco's net profits. By awarding damages for losses through March, the jury must have determined that the period of restoration lasted through March 2019, rather than November 2018. We will uphold those damages if we can uphold that determination.

In reviewing the jury's verdict, we look only to see if it is supported by substantial evidence. *See Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 279 (4th Cir. 1999). Substantial evidence is a low bar: The verdict must stand unless no rational factfinder could agree with the jury. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

There was indeed substantial evidence to support the jury's conclusion that the period of restoration lasted through March: *i.e.*, that it took Ramaco until March to restore its operations to the level that would generate the net profits that would have existed but for the collapse. As discussed, Ramaco's total coal output had returned to the pre-collapse level by November. But Ramaco presented evidence that it was still suffering from collapse-related increased costs until March.[7] So the jury could have reasonably concluded that it was not until March that Ramaco restored its operations to the level that would

---

[7] To provide a few examples, Ramaco presented evidence about the costs that it incurred in demolishing Silo 1 and building the bypass belts—construction that it obviously would not have needed to do absent the hopper collapse. Ramaco also presented evidence that it had to create coal stockpiles due to the collapse. This increased costs because, rather than transporting coal directly from the mine to the silos, Ramaco had to "double handle" the coal, taking it from the mine to the stockpile and then from the stockpile to the preparation plant. Additionally, Ramaco ran its processing plant overtime in December: it kept the plant running for 27.5 days that month, whereas pre-collapse the plant operated 15–16 days a month.

11

generate the net profits that would have existed but for the collapse.[8]  And, viewed most favorably to Ramaco, the evidence also established that—during the period of restoration (November 2018 to March 2019)—Ramaco incurred $7.1 million in increased costs and lost revenue from contracts that it could not fulfill because of the collapse.  Sufficient evidence thus supports the jury's $7.6 million award of contract damages and prejudgment interest.[9]  Accordingly, we reverse the district court's grant of judgment as a matter of law to Federal.

---

[8] Federal protests, arguing that Ramaco presented its increased costs as "extra expenses," rather than evidence of lower net profit, and so failed to preserve this argument. But extra expense is just another way to say increased costs.  The policy defines extra expense as "necessary expenses you incur . . . in an attempt to continue operations, over and above the expenses you normally would have incurred."  J.A. 570.  And, as already explained, added costs are integral to calculating net profit.

[9] Federal also effectively argues that Ramaco did not act with "reasonable speed" to restore its operations.  According to Federal, the policy did not cover the time needed to fix Silos 2 and 3 by adding steel supports.  And so the period of restoration should have ended when Ramaco was able—using reasonable speed—to resume operations using Silos 2 and 3, which Federal claims was November 30.  The jury evidently rejected this argument, since otherwise it would not have awarded damages through March.

After the trial, the district court disagreed, finding that Ramaco could have restored its throughput of coal by using Silos 2 and 3 as of November 30, and that the policy did not cover time needed to upgrade those silos.  But a court should not disturb the jury's decision when there is substantial evidence to support it.  Ramaco's expert testified that it would have been "ludicrous" for Ramaco to resume using Silos 2 and 3 before installing steel supports to the hoppers in those silos.  J.A. 1042.  He explained that doing so would have "jeopardize[d] worker safety" and "could have exposed some of their employees to injury or death."  *Id.*  So choosing not to resume using Silos 2 and 3 until installing the supports "was the only thing [Ramaco] could have done."  *Id.*  From this testimony, the jury could reasonably have concluded that "reasonable speed" did not demand that Ramaco use Silos 2 and 3 in November 2018, before it had the chance to install the steel supports.  Because substantial evidence supports the jury's conclusion, we will not replace it with a judgment that Ramaco could have restored its level of operations by using Silos 2 and 3 without installing those supports.

12

**B.      Ramaco may seek *Hayseeds* damages in a new trial**

We now turn to the *Hayseeds* award.  Under West Virginia's *Hayseeds* doctrine, a policyholder seeking coverage under an insurance policy who "substantially prevails" in a suit against their insurer is entitled to a damages award for net economic loss and aggravation and inconvenience from the delay in receiving coverage, as well as attorney's fees.  Syl. Pt. 1, *Hayseeds*, 352 S.E.2d at 74.  The jury awarded Ramaco $25 million in aggravation and inconvenience damages.  The district court vacated this award.  It reasoned that, under its interpretation of the period of restoration, Ramaco was only entitled to $1.6 million in contract damages, rather than $7.1 million.  This decreased contract damages award meant that Ramaco did not substantially prevail and was thus not entitled to *Hayseeds* damages.[10]  The court also conditionally granted Federal a new trial on *Hayseeds* damages in case we determined Ramaco did substantially prevail.  We address each ruling in turn.

### 1.      Ramaco substantially prevailed, so it is entitled to *Hayseeds* damages

An insured party "substantially prevails" against its insurer when the jury awards "an amount equal to or approximating the amount claimed by the insured."  Syl. Pt. 1,

---

[10] Because it ultimately held that Ramaco did not substantially prevail, the district court had no reason to award Ramaco attorney's fees under *Hayseeds*.  *See* Syl. Pt. 1, *Hayseeds*, 352 S.E.2d at 74 ("Whenever a policyholder substantially prevails . . . against its insurer, the insurer is liable for . . . the insured's reasonable attorney's fees in vindicating its claim."); Syl. Pt. 3, *Richardson v. Ky. Nat'l. Ins. Co.*, 607 S.E.2d 793, 795 (W. Va. 2004) (explaining that a judge calculates the amount of attorney's fees awarded under *Hayseeds*).

*Jordan v. Nat'l. Grange Mut. Ins. Co.*, 393 S.E. 2d 647, 647–48 (W. Va. 1990). When determining whether an insured substantially prevailed, "a court should look at the negotiations as a whole from the time of the insured event to the final payment of the insurance proceeds." Syl. Pt. 4, *Miller v. Fluharty*, 500 S.E.2d 310, 313 (W. Va. 1997). Yet this is not a "purely mathematical calculation." *Hadorn v. Shea*, 456 S.E.2d 194, 198 (W. Va. 1995). A court must consider each party's efforts to settle and the need for an insured to hire an attorney to receive coverage. Syl. Pts. 3 & 4, *Miller*, 500 S.E.2d at 313–14; *Hadorn*, 456 S.E. 2d at 198–99.

Considering all these factors, the district court held that, once Ramaco's contract damages were reduced to $1.6 million, it no longer substantially prevailed. This ruling can no longer stand, as it was based on the district court's erroneous interpretation of the period of restoration. The proper inquiry is whether Ramaco substantially prevailed based on the reinstated jury award of $7.1 million.[11] It did.[12]

---

[11] When it considered whether Ramaco had substantially prevailed under the reduced damages award, the district court considered only Ramaco's new contract damages ($1.6 million), and did not include prejudgment interest (which increased Ramaco's award to $1.8 million).

We do not take position on whether it is appropriate to exclude prejudgment interest when deciding whether a party "substantially prevailed" under *Hayseeds*. But, because the parties did not raise this issue and it has no effect on our conclusion, we'll mirror what the district court did in its post-trial order, and will consider whether Ramaco substantially prevailed based on its contract-damages award alone ($7.1 million), rather than considering Ramaco's contract damages plus prejudgment interest ($7.6 million).

[12] Before reducing Ramaco's contract damages and prejudgment interest to $1.8 million, the district court itself determined that Ramaco had substantially prevailed under the original jury award of $7.6 million.

14

Ramaco substantially prevailed because the $7.1 million contract-damages verdict is about equal to what Ramaco claimed throughout the litigation. *See Miller*, 500 S.E.2d at 321 (instructing courts to look to "totality of the policyholder's negotiations with the insurance carrier"). As the district court noted, Ramaco explained to Federal in March 2019 that it had suffered roughly $6 million in damages. And Ramaco's final settlement offer before trial was for $11.8 million. This settlement offer was all-inclusive, comprised of both contract damages and *Hayseeds* damages. Excluding the *Hayseeds* portion of this demand, it approximates the $7.1 million in contract damages that Ramaco won at trial. And that award is far more than the $2.1 million that Federal offered. *See* Syl Pt. 2, *Thomas v. State Farm Mut. Auto. Ins. Co.*, 383 S.E. 2d 786, 787 (W. Va. 1989) ("Where the insurance company has offered an amount materially below the damage estimates submitted by the insured, and the jury awards the insured an amount approximating the insured's damage estimates, the insured has substantially prevailed.").

Other considerations also suggest that Ramaco substantially prevailed. Federal did not offer to settle the claim for anything until after Ramaco filed suit. *See* Syl. Pt. 1, *Jordan*, 393 S.E.2d at 648 (noting that courts should consider whether an "attorney's services were necessary to obtain payment of the insurance proceeds"). Even then, Federal's initial settlement offers were for $100,000 and $200,000, respectively, and it continued to dispute liability until the jury returned its verdict. Looking at "the negotiations as a whole," Ramaco substantially prevailed. *See* Syl. Pt. 4, *Miller*, 500 S.E.2d at 313.

Federal's arguments to the contrary are unpersuasive. Federal first argues that Ramaco cannot receive aggravation and inconvenience damages under *Hayseeds* because

15

it is a large, publicly traded corporation. But this argument is belied by *Hayseeds* itself. The only defendant in *Hayseeds* was a corporation, Hayseeds Inc. 352 S.E.2d at 73. In that case, the Court affirmed the jury's $69,000 award of attorney's fees and consequential damages. *Id.* at 74–75. The Court explained that the consequential damages included the "net economic loss caused by the delay in settlement" and "an award for aggravation and inconvenience." *Id.* at 80. *Hayseeds* thus suggests that a corporation can receive aggravation and inconvenience damages.[13]

Federal also argues that, even considering the $7.1 million award, Ramaco did not substantially prevail. Federal points to Ramaco's identification of $19.6 million in contract damages during discovery and Ramaco's settlement offers during litigation: $32 million, $25 million, and $11.8 million. Comparing these figures to the $7.1 million in contract damages that the jury awarded, Federal argues that Ramaco cannot have substantially prevailed because it did not receive "an amount equal to or approximating the amount claimed by the insured." Syl. Pt. 1, *Jordan*, 393 S.E.2d at 647.

---

[13] Federal points to dicta in a later West Virginia case in which the Supreme Court of Appeals said that it is "open to debate" whether a corporation can receive "personal damages in the nature of aggravation, annoyance, and inconvenience." *AIG Domestic Claims, Inc. v. Hess Oil. Co.*, 751 S.E.2d 31, 39 (W. Va. 2013). But *AIG* did not concern a *Hayseeds* claim. And, in *Hayseeds* itself, the Court was clear that a corporation can receive aggravation and inconvenience damages. *See* 352 S.E.2d at 80. Further, despite proclaiming in *AIG* that this question was "open to debate," the Supreme Court of Appeals has not addressed it since. Nor has it ever held that a corporation cannot receive *Hayseeds* damages for aggravation and inconvenience. So we decline to depart from *Hayseeds*'s explicit holding.

16

These comparisons are misplaced. The $19.6 million figure is unimportant because it represents only one estimate proffered in discovery by Ramaco. Focusing solely on that number ignores the directive to "look at the negotiations as a whole." Syl. Pt. 4, *Miller*, 500 S.E. 2d at 313. And Federal's focus on Ramaco's settlement offers ignores the fact that those offers were all-inclusive—containing demands for contract damages, aggravation and inconvenience damages, and attorney's fees. So we can't compare the whole settlement figures against the jury's $7.1 million, because that award represents only one part of the settlement figure: contract damages. Taking that into account, Ramaco did substantially prevail. So it is entitled to *Hayseeds* damages.

### 2.      The district court reasonably required a new *Hayseeds* trial

Because Ramaco may receive *Hayseeds* damages, we turn to the district court's conditional holding that Federal is entitled to a new trial on this issue. We agree with the district court that a new trial on *Hayseeds* damages is necessary.

A "district court ha[s] a duty to order a new trial if . . . required in order to prevent injustice." *Wilhelm v. Blue Bell, Inc.,* 773 F.2d 1429, 1433 (4th Cir. 1985) (cleaned up); *see also* Fed. R. Civ. P. 59(a). We review a district court's order granting a new trial only for abuse of discretion, "giv[ing] the benefit of every doubt to the judgment of a trial judge" and remembering that they are best positioned to weigh evidence and consider witness credibility. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998) (cleaned up); *see also Stamathis v. Flying J, Inc.*, 389 F.3d 429, 436 (4th Cir. 2004) (explaining that whether a new trial is warranted "rests with the sound discretion of the trial judge").

17

The district court correctly pointed out that punitive damages are unavailable under *Hayseeds*.[14]  *See* Syl. Pt. 2, *Hayseeds*, 352 S.E.2d at 74.  And it determined that the jury's *Hayseeds* award included punitive damages.  So it held that Federal was entitled to a new trial on *Hayseeds* damages.[15]  After all, awarding damages that are not legally available would constitute injustice.  Our question is thus whether it was an abuse of discretion to find that some part of the $25 million *Hayseeds* award was punitive.

It was not.  The only evidence that Ramaco presented in the trial's *Hayseeds* phase was the testimony of its Chief Operating Officer, Christopher Blanchard.  Blanchard testified that Federal's coverage denial drove Ramaco to the brink of bankruptcy.  He explained that bankruptcy "would have meant 350 families without a job," J.A. 1140, and that the denial "was stressful for the business and it was stressful for me," J.A. 1145.  This testimony might support some aggravation and inconvenience damages.  But it is hard to conceive how the jury extrapolated the $25 million figure from Blanchard's testimony

---

[14] There is an exception to this rule if the insurer acted with actual malice.  Syl. Pt. 2, *Hayseeds*, 352 S.E.2d at 74.  But that exception is not at issue here.

[15] In doing so, the district court also held that *Hayseeds* damages are necessarily excessive under West Virginia law if they are punitive.  It is not clear that this is correct, given that *Hayseeds* itself set aside a *Hayseeds* damages award as "punitive" without also calling those damages "excessive."  *See Hayseeds*, 352 S.E.2d at 81.  And West Virginia has a separate standard for determining when a damage award is excessive that does not obviously include all improperly punitive damages.  *See* Syl. Pt., *Addair v. Majestic Petroleum Co.*, 232 S.E.2d 821, 821 (1977) (explaining a court may only set aside a jury's verdict as excessive if it is "monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show[s] jury passion, partiality, prejudice or corruption").  But we need not decide whether an improperly punitive *Hayseeds* award is also excessive since a punitive *Hayseeds* award by itself, in this context, would be unlawful.

18

without deciding that it had to punish Federal. *Cf. Hayseeds*, 352 S.E.2d at 80 ("[A] large corporation with an in-place, organized collective intelligence that must litigate a claim for several years may suffer substantial net economic loss but little aggravation and inconvenience."); *Andrews v. Reynolds Mem'l Hosp., Inc.*, 520 S.E.2d 185, 185 (W. Va. 1998) (Maynard, J., dissenting) ("Because 1.2 million dollars' worth of inconvenience and aggravation is hard to imagine, I believe it was obvious this was a punitive damage award in clear violation of *Hayseeds*." (cleaned up)).  Given the award's size compared to the limited trial evidence, the district court did not abuse its discretion in concluding that the award must have been punitive. *Cf. Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 438 (1996) (holding that district courts have the "primary responsibility" for applying the state-law excessiveness standard because they have "the unique opportunity to consider the evidence in the living courtroom context, while appellate judges see only the cold paper record." (cleaned up)).

Therefore, we affirm the district court's alternative holding ordering a new trial on *Hayseeds* damages.[16]  On remand, the district court should also calculate attorney's fees for Ramaco.  *See* Syl. Pt. 1, *Hayseeds*, 352 S.E.2d at 74 ("Whenever a policyholder

---

[16] Ramaco has asked that we give it the option of remittitur.  To determine an appropriate remittitur, we must identify "the outermost award that could be sustained." *Eshelman v. Puma Biotechnology, Inc.*, 2 F.4th 276, 285 (4th Cir. 2021) (quoting *Konkel*, 165 F.3d at 282)).  When damages are inherently difficult to quantify—as the aggravation and inconvenience damages are—calculating "the outermost award that could be sustained" is no easy task.  Given this difficulty, and the fact that we need not offer a remittitur, we decline to do so here.  *See id.* at 285 (declining to offer a remittitur when the court could not determine the outermost award that could be sustained).

substantially prevails . . . against its insurer, the insurer is liable for . . . the insured's reasonable attorney's fees in vindicating its claim."); Syl. Pt. 3, *Richardson*, 607 S.E.2d at 795 (noting that "the amount of the attorney's fee is to be determined by the [trial] judge and not by a jury").

\*          \*          \*

West Virginia law requires courts to give insurance policies their plain, ordinary meaning whenever possible. *See* Syl. Pt. 2, *Chafin*, 751 S.E.2d at 766. Here, the policy's plain language extended the period of restoration until Ramaco's operations were restored to the level generating the net profits that would have existed but for the collapse. To determine that level, a court must consider both throughput and expenses. The district court did not. Using the proper measure of the period of restoration, there was sufficient evidence for the jury to award $7.1 million in contract damages (for a total of $7.6 million including prejudgment interest). And considering that $7.1 million award, Ramaco "substantially prevailed" against its insurer, so it is entitled to *Hayseeds* damages. But a *Hayseeds* award cannot include punitive damages. So the district court did not abuse its discretion in ordering a new trial on *Hayseeds* damages. Accordingly, the district court's order is

*REVERSED IN PART,*
*AFFIRMED IN PART,*
*AND REMANDED.*

20