IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2024 Term

_____

No. 22-0362

_____

FILED

June 12, 2024

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

ELDERCARE OF JACKSON COUNTY,
LLC, d/b/a Eldercare Health and Rehabilitation,
a Tennessee company;
COMMUNITY HEALTH ASSOCIATION,
d/b/a JACKSON GENERAL HOSPITAL,
a West Virginia corporation;
and IRVIN JOHN SNYDER, D.O.,
Defendants Below/ Petitioners,

v.

ROSEMARY LAMBERT and CAROLYN HINZMAN,
Individually, and as Co-Executors of
the Estate of Delmar P. Fields,
Plaintiffs Below/Respondents.

_____

Appeal from the Circuit Court of Jackson County
The Honorable Lora A. Dyer Judge
Civil Action No. 21-C-32

AFFIRMED, IN PART; REVERSED, IN PART;
AND REMANDED

_____

Submitted: January 10, 2024
Filed: June 12, 2024

Mark A. Robinson, Esq.
Flaherty Sensabaugh Bonasso, PLLC
Charleston, West Virginia
Counsel for Eldercare of Jackson County,
LLC, d/b/a Eldercare Health and

Kelly Elswick-Hall, Esq.
The Masters Law Firm L.C.
Charleston, West Virginia
Counsel for Respondents

Rehabilitation

Jace H. Goins, Esq.
Christopher S. Etheredge, Esq.
Steptoe & Johnson, PLLC
Charleston, West Virginia
Counsel for Community Health
Association d/b/a Jackson General
Hospital and Irvin John Snyder, D.O.

Salem C. Smith, Esq.
Shereen Compton McDaniel, Esq.
Flaherty Sensabaugh Bonasso, PLLC
Charleston, West Virginia
Co-Counsel for Irvin John Snyder, D.O.

JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE BUNN deeming herself disqualified, did not participate in the decision of this case.

JUDGE EWING, sitting by temporary assignment.

CHIEF JUSTICE ARMSTEAD dissents and reserves the right to file a separate opinion.

**SYLLABUS BY THE COURT**

1. "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dept. of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

2. "'The trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957)." Syl. Pt. 3, *Chapman v. Kane Transfer Co.*, 160 W. Va. 530, 236 S.E.2d 207 (1977).

3. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. Pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975).

4. "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951).

5. "It is not for this Court arbitrarily to read into a statute that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the Legislature purposely omitted." Syl. Pt. 11, *Brooke B. v. Ray C.*, 230 W. Va. 355, 738 S.E.2d 21 (2013).

6. West Virginia Code § 55-19-7 (2021) of the COVID-19 Jobs Protection Act provides that the limitations on liability specified in the Act "shall not apply to any person, or employee or agent thereof, who engaged in intentional conduct with

i

actual malice." Proof of actual malice requires evidence that the person, or employee or agent acted with the deliberate intent to commit an injury, as evidenced by external circumstances.

**HUTCHISON, Justice**:

In this appeal, Petitioners Eldercare of Jackson County, LLC, d/b/a Eldercare Health and Rehabilitation; Community Health Association, d/b/a Jackson General Hospital; and Irvin John Snyder, D.O. seek the reversal of an order of the Circuit Court of Jackson County denying their respective motions to dismiss the complaint filed by Respondents Rosemary Lambert and Carolyn Hinzman following the death of their father, Delmer P. Fields. Mr. Fields contracted COVID-19 while a resident at Eldercare and died while under the care of Jackson General and Dr. Snyder.[1] Petitioners contend that they are immune from liability for Mr. Fields's death under the COVID-19 Jobs Protection Act (also referred to as "the Act"), West Virginia Code §§ 55-19-1 through 9 (2021), and hence, respondents failed to state a claim upon which relief can be granted.[2] We conclude that the factual allegations in respondents' complaint sufficiently pled that Eldercare engaged in "intentional conduct with actual malice" in connection with Mr. Fields's death from COVID-19. *See* W. Va. Code § 55-19-7. Such intentional and malicious misconduct is specifically excepted from the limitations on liability afforded under the Act. *See id.* Therefore, we affirm the circuit court's order denying Eldercare's motion to dismiss.

---

[1] The complaint alleges that Dr. Snyder "was a physician engaged in the business of providing health care services to. . . [Mr.] Fields at and for Eldercare and Jackson General." A motion to dismiss was jointly filed on behalf of Jackson General and Dr. Snyder, while Eldercare filed a motion to dismiss on its own behalf. However, Eldercare, Jackson General, and Dr. Snyder now jointly appeal the order denying their respective motions to dismiss.

[2] *See* W. Va. R. Civ. P. 12(b)(6).

1

However, we reverse the circuit court's order insofar as it denied the motion to dismiss filed jointly by Jackson General Hospital and Dr. Snyder, as the factual allegations against these parties were insufficient to establish that the statutory exception to the limitations on liability afforded under the COVID-19 Jobs Protection Act applies.

## I.     Factual and Procedural Background

At this stage of the proceedings, we are required to accept as true the factual allegations of the complaint. As we have often instructed, "Since the preference is to decide cases on their merits, courts presented with a motion to dismiss for failure to state a claim construe the complaint in the light most favorable to the plaintiff, taking all allegations as true." *Sedlock v. Moyle*, 222 W. Va. 547, 550, 668 S.E.2d 176, 179 (2008) (citing *John W. Lodge Distrib. Co. v. Texaco, Inc.*, 161 W. Va. 603, 604-05, 245 S.E.2d 157, 158-59 (1978)). Accordingly, our recitation of the relevant facts is derived from the allegations as presented by respondents in their complaint.

Respondents allege that Eldercare has a history of failing to establish and maintain an effective infection control policy at its facility. In August of 2019, Eldercare experienced an outbreak of "an unknown respiratory illness resembling the flu." Eldercare did not report the outbreak to the Jackson County Health Department until after inspectors arrived at the facility for a surprise inspection. Further, according to an August 21, 2019, report, Eldercare "was cited 17 times for health violations" – which is "five more violations than the average number of citations for West Virginia nursing homes and 8.8 more than the U.S. average." The report noted that Eldercare's deficient infection control practice

2

could potentially affect all residents living at the facility. According to the complaint, Eldercare was also frequently understaffed, with only one or two certified nursing assistants (CNAs) caring for twenty to twenty-eight residents (or more) at a time even though four CNAs and a charge nurse were required to be on each hall of the facility. During the five years preceding the events described in the complaint, Eldercare was required to have five nurses on site but it was "lucky if [it] had two."

The complaint alleges that, since at least February 2020, not long after the August 2019 report was issued, petitioners "were on high-alert for COVID-19." Eldercare advised its employees that they would be notified of any COVID-positive cases at the facility "for the protection of residents and staff." However, respondents allege that, contrary to these assurances, when residents began running fevers and showing other symptoms of COVID-19, such as coughing or breathing problems, Eldercare management informed employees that "the symptoms were just the flu and not COVID." For example, in March of 2020, when a certain Eldercare resident died after developing "a really high fever," Eldercare management did not inform staff as to whether the deceased resident had tested positive for COVID-19; however, soon after that, staff was given one paper surgical mask and told to wear it when entering a resident's room. Staff was not told whether to wear the mask in the common areas or dining room.

Respondents' complaint further alleges that, in the two weeks preceding April 9, 2020, multiple Eldercare residents became ill. Although Eldercare was a 120-bed facility with only eighty-six residents, sick residents continued to remain in their rooms

3

with other residents. Only when the unwell resident developed severe symptoms did Eldercare staff move the other resident out of the room. The other resident would then be moved to another room with another resident "where the same thing would happen" all over again. Respondents contend that ailing residents were not tested for COVID-19 even when they showed symptoms of COVID, because Eldercare "did not want to know [the residents] were [COVID] positive. During this time frame, at least two or three residents died. Petitioner Eldercare claimed to staff that the deaths were not due to COVID."

When an Eldercare employee reportedly asked management whether the ill patients had contracted COVID, Eldercare Administrator Todd Kimball responded, "[I]t's not COVID, it's not the plague, you're not going to catch it." Though employees were eventually issued surgical masks, "Eldercare did not tell employees caring for residents who[,] or that anyone was[,] positive" for COVID-19.

During this same time, after an Eldercare employee cared for an obviously sick resident for approximately seven hours, the employee was advised by Eldercare that the resident was COVID-19 positive. Even though Eldercare either knew or suspected that the resident was COVID positive, respondents allege that it "intentionally never told the employee." The Eldercare employee assumed that, for her own safety and the safety of Eldercare residents, she would need to quarantine after being exposed to COVID-19. The employee contacted her immediate supervisor who later related to the employee that the employee was not to quarantine, and that administrator Kimball was "accepting [the employee's] resignation." The employee had cared for the ill resident for the two weeks

4

prior and, unknowingly, cared for other COVID-positive residents during that time. The employee obtained a COVID test on her own and tested positive. She contracted COVID-19 at Eldercare.

Without disclosing that residents had tested positive for COVID-19, the facility began "closing doors to certain halls" while "falsely telling employees it was [closing doors due to] the flu, not COVID." Residents continued to eat together in the dining hall. Administrator Kimball distributed N-95 masks to some of the nurses; however, an Eldercare employee, whose job included delivering food trays to residents' rooms, was never provided even a surgical mask nor told to wear a mask around residents. Kimball— whose face was described as "bright red"—angrily accused that same employee of contacting the "local health department to confidentially report a COVID outbreak" at Eldercare. Kimball told the employee that he wanted to "fire [him] right there, but he wanted to check with corporate first to see if he could." The employee, who denied that he had made the anonymous call, "was given two separate write ups, and then suspended." The next day, Eldercare terminated his employment. During this time, administrator Kimball was heard to remark that "the last thing he wanted was the media to get ahold of this place." It was not until after Kimball learned of the anonymous call to the local health department that Eldercare reported the facility's first case of COVID-19 to authorities.

The complaint alleges that on or about April 7, 2020, another Eldercare employee was assigned to care for a resident who was not feeling well and had a fever. One of the employee's tasks was brushing the resident's teeth three times per day. While

5

the employee wore a paper surgical mask, the ill resident did not wear a mask. The employee "also went on to care for other residents as normal." On the second day of caring for the ill resident, the employee learned that "someone had tested positive for COVID" and asked administrator Kimball directly whether it was the ill resident the employee had been caring for who had tested positive. Kimball "falsely assured said employee that it was not the resident said employee cared for" and specifically advised the employee that she "was nowhere around" the patient who had tested positive for COVID-19. The next morning, the employee learned that the ill resident for which she had been caring for two days "was, in fact, positive for COVID, contrary to what said employee was falsely told by defendant Eldercare management Kimball." The COVID-positive resident "was [also] out in the facility around other residents." The complaint alleges that, although Eldercare "did not tell said employee to get tested [for COVID-19], did not arrange for any testing, and did not offer any testing[,]" the exposed employee nonetheless assumed that she would need to quarantine and so advised someone at Eldercare. When the employee (who had worked for Eldercare for thirty years) contacted her employer several days later "to see what the next step was," she was informed that because she "did not show up [to work] for two days," her employment was terminated.

Respondents allege that, prior to April 13, 2020, Eldercare's policy required employees who were exposed to COVID-19 to continue to work (and not to quarantine). Eldercare also directed employees who cared for COVID-positive residents in one room to "go into the next room to care for [residents] who were not COVID positive." When the

6

family member of a certain Eldercare resident requested the resident be tested for COVID-19 because the resident "had been symptomatic for weeks," Eldercare refused. Instead, Eldercare tested the resident for the flu. The resident died of COVID-19 on April 18, 2020. Another resident also died of COVID-19 in April of 2020 after experiencing symptoms for more than two weeks. Although that resident's wife "begged [Eldercare] to get him tested, . . . Eldercare kept telling [her] the resident was fine."

The complaint alleges that, in contrast to what was actually occurring at its facility, Eldercare represented to health officials, family members of Eldercare residents and the public, including respondents, that all staff were wearing full PPE[3] and that "the facility continue[d] to take strong infection control measures[.]" Administrator Kimball advised both respondents and the general public that Eldercare had put in place "stringent health protocols[,]" that Eldercare was "proactive[,]" and that "[o]ur top priority is to keep our patients and residents safe." Kimball also advised respondents and the public that "patients testing positive were quarantined within the facility as per CDC guidelines and that Eldercare has not let any employee work if they were ill or pending [COVID-19] test results."

---

[3] "PPE" stands for "personal protective equipment." *See* W. Va. Code § 55-19-3(12) ("'Personal protective equipment' means coveralls, face shields, gloves, gowns, masks, respirators, or other equipment designed to protect the wearer or other persons from the spread of infection or illness.").

7

Respondents' father had been admitted to Eldercare in January of 2020 for rehabilitation due to back fractures and dementia, with potential for long-term placement. Respondents' mother, Phoebe Fields, was also an Eldercare resident, as she suffered from COPD and strokes. In April 2020, Respondent Lambert learned that COVID-19 had spread to nursing homes, and so she contacted various Eldercare personnel, including nurses; the Director of Nursing, Bobbie Jo Nichols; and administrator Kimball. On or about April 9, 2020, Respondent Lambert was advised that "there was only one positive case" at Eldercare; that "that person was isolated in a different area from" Respondent Lambert's parents, "in lockdown"; and that Mr. and Mrs. Fields "were fine and had no symptoms." When Respondent Lambert "asked whether she should take [her parents] home[,]" she was specifically advised that "they were safer at Eldercare."

Although respondents were not permitted to visit their parents at Eldercare due to the COVID-19 pandemic, they observed their parents and other residents through the facility's windows. Respondents observed that the residents were "all together" just as they were prior to COVID-19; "they were not separated by six feet of distance, or really any distance"; that "[m]any if not all of the staff . . . were not wearing masks and none of the residents [Respondent Lambert] saw were wearing masks." From Respondent Lambert's observations, Eldercare did not even take "basic precautions."

Respondent Lambert specifically asked Eldercare staff whether her father should be tested for COVID-19. She was told that he was "fine," and so she did not immediately remove him from Eldercare. However, on April 13, 2020, after deciding that

8

her father should no longer remain at the facility—a decision that "Eldercare personnel tried to talk her out of"—Respondent Lambert picked him up and found him to be "in terrible shape," with "multiple bruises" and "smell[ing] of urine." The complaint alleges that "[h]e was so sick, he had to be carried into the house." Eldercare staff advised Respondent Lambert that her father "just had a UTI." Within twenty-four hours of arriving at Respondent Lambert's home, however, Mr. Fields was taken by ambulance to the emergency room at Petitioner Jackson General Hospital where he was diagnosed with "a head injury with hemorrhage from a fall at Eldercare." Mr. Fields also tested positive for COVID-19. His medical records specifically indicate that he had been exposed to COVID-19 at Eldercare, this being directly contrary to what Respondent Lambert was told by Eldercare staff upon inquiry. Eldercare never told Respondent Lambert that any of the residents had tested positive for COVID-19 or that her father had been exposed to COVID-19.

Mr. Fields' evaluation in the emergency room at Jackson General on April 14, 2020, revealed that he "had diminished breath sounds bilaterally with wheezing in the lower lung fields, a symptom of COVID-19" and "[h]is chest x-ray showed atelectasis." By early the next day, he was placed on two liters of oxygen, which soon progressed to four liters and then six liters. His oxygen saturation level was 91% on six liters of oxygen. The day before his death, Mr. Fields' oxygen saturation level was documented as 87% on five liters of oxygen. Despite Mr. Fields' increasing respiratory distress, hospital records failed to indicate a "work up for hypoxemia" over the course of his stay and showed that

9

there was "no repeat chest x-ray," and "no meaningful discussion of his COVID positive status by [Petitioners Dr.] Snyder and Jackson General." Even after acknowledging Mr. Fields' positive COVID-19 diagnosis, one day prior to his death, Dr. Snyder stated that Mr. Fields was "clinically stable and his UTI could be treated with over-the-counter antibiotics, indicating that Mr. Fields could be discharged[,]" and "even suggesting at one point that [he] could be discharged back to defendant Eldercare, but [Respondent] Lambert said no."

Mr. Fields died on April 18, 2020. His cause of death was noted as "multifactorial secondary to complications of aging and dementia exacerbated by acute COVID positive state, UTI with E. coli, and cerebral hemorrhage." His immediate cause of death was listed as "COVID-19." Mrs. Fields had died the previous day; she "was also positive for COVID-19."

On April 16, 2020, two days before Mr. Fields' death (and one day before Mrs. Fields' death), the governor of West Virginia deployed the West Virginia National Guard to Eldercare to conduct COVID-19 testing of residents and staff due to the facility's alleged failure to report positive cases, and in response to the anonymous call to the Jackson County Health Department. The governor was quoted as being "upset" that someone may have "hid something or made a bad decision [as] that's not acceptable[.]" The governor also noted that nursing home residents "are the most vulnerable of the vulnerable people. And we have told our people point blank that when we have one person . . . in an outbreak

10

in a nursing home to run to the fire and test everybody there, all the employees and everybody[.]"

In all, seventy-one of the eighty-six Eldercare residents became infected with COVID-19, and fifteen residents died, including both of respondents' parents. Thirty-two Eldercare staff also tested positive for COVID-19.

Respondents are the duly appointed co-executors of their father's estate. Their complaint against petitioners alleges claims of fraud, misrepresentation, and fraudulent concealment (Count 1); civil conspiracy (Count 2); breach of duties of care (Count 3); elder abuse (Count 4); violations of the West Virginia Patient Safety Act (Count 5); and invalidity of an arbitration clause (Count 6).

Petitioners filed motions to dismiss, arguing that because respondents' claims arise from and relate to the COVID-19 pandemic and healthcare services rendered as a result thereof, the COVID-19 Jobs Protection Act applies to confer absolute immunity upon petitioners from liability in this case. As such, petitioners argued, respondents failed to state a claim upon which relief could be granted and so dismissal pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure was appropriate. In their response to the motions to dismiss, respondents argued that the limitations on liability provided in the Act "shall not apply to any person, or employee or agent thereof, who engaged in intentional conduct with actual malice[,]" W. Va. Code § 55-19-7, and that the complaint includes factual allegations and inferences arising therefrom that are to be accepted as true

11

and that satisfy this exception such that the limitations on liability afforded by the Act do not apply.

In an order entered April 11, 2022, the circuit court denied petitioners' motions to dismiss. Observing that the term "actual malice" is not defined in the Act, the circuit court relied on this Court's definition of that term as set forth in *Hayseeds, Inc. v. State Farm Fire & Casualty*, 177 W. Va. 323, 352 S.E.2d 73 (1986), and ruled that, for purposes of determining whether the statutory exception set forth in West Virginia Code § 55-19-7 applies, "'actual malice' requires proof that the defendant acted with the intent to injure or harm the plaintiff and/or decedent.'" Applying this definition to the factual allegations of the complaint, the circuit court concluded that respondents "have alleged sufficient facts . . . to survive a motion to dismiss." It is from this order that petitioners now appeal.

## II. Standard of Review

At issue in this appeal is whether the circuit court erred in denying petitioners' respective motions to dismiss respondents' complaint. Though interlocutory in nature, an order denying a motion to dismiss that is predicated on statutory immunity is immediately appealable under the "collateral order" doctrine. *See* Syl. Pt. 5, *State ex rel. Grant Cnty. Comm'n v. Nelson*, 244 W. Va. 649, 856 S.E.2d 608 (2021).[4] Our review of

---

[4] Petitioners also argue that the circuit court erred in denying their respective motions to dismiss respondents' claims for reasons other than the immunity afforded under the COVID-19 Jobs Protection Act. Petitioners' arguments in this regard were not

Continued . . .

the circuit court's order denying the motions to dismiss is *de novo*, *see* syl. pt. 4, *Ewing v. Bd. of Educ. of Summers Cnty.*, 202 W. Va. 228, 503 S.E.2d 541 (1998), which, in this particular case, includes a review of the propriety of the court's interpretation of West Virginia Code § 55-19-7. "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dept. of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

"Rule 8(f) of the West Virginia Rules of Civil Procedure dictates that courts liberally construe pleadings so 'as to do substantial justice[,]'"[5] *Mountaineer Fire & Rescue Equip., LLC v. City Nat'l Bank of W. Va.*, 244 W. Va. 508, 520, 854 S.E.2d 870, 882 (2020),

---

addressed in the order that is now on appeal; rather, the circuit court's interlocutory order addressed the applicability of West Virginia Code § 55-19-7 of the Act exclusively, and for that reason, the order was immediately appealable under the "collateral order" doctrine. *See Robinson v. Pack*, 223 W. Va. 828, 833, 679 S.E.2d 660, 665 (2009) (explaining that the collateral order doctrine applies because, inter alia, a ruling on whether a party is immune from suit is "'effectively unreviewable' at the appeal stage. . . . Traditional appellate review of [such a ruling] cannot achieve the intended goal of an immunity ruling: 'the right not to be subject to the burden of trial.'" (quoting *Hutchison v. City of Huntington*, 198 W. Va. 139, 148, 479 S.E.2d 649, 658 (1996)). Petitioners do not argue that the interlocutory denial of their motions to dismiss on other grounds is immediately subject to our appellate jurisdiction, and we see no reason why those grounds are presently reviewable by this Court. *See Credit Acceptance Corp. v. Front*, 231 W. Va. 518, 522-23, 745 S.E.2d 556, 560-61 (2013) (explaining that, typically, interlocutory orders are not subject to this Court's appellate jurisdiction so as to "prohibit 'piecemeal appellate review of trial court decisions which do not terminate the litigation'" but recognizing that "[e]xceptions to the rule of finality include 'interlocutory orders which are made appealable by statute or by the West Virginia Rules of Civil Procedure, or . . . [which] fall within a jurisprudential exception' such as the 'collateral order' doctrine." (Internal citations omitted)).

[5] Rule 8(f) of the West Virginia Rules of Civil Procedure states: "*Construction of Pleadings.*—All pleadings shall be so construed as to do substantial justice."

and so "'[t]he trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Syl. Pt. 3, *Chapman v. Kane Transfer Co.*, 160 W. Va. 530, 236 S.E.2d 207 (1977) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Although we construe the factual allegations of the complaint, including all inferences arising therefrom, in the light most favorable to respondents, *Chapman*, 160 W. Va. at 538, 236 S.E.2d at 212, we are also guided by the principle that, "in civil actions where immunities are implicated, the trial court must insist on heightened pleading by the plaintiff." *Hutchison v. City of Huntington*, 198 W. Va. 139, 149, 479 S.E.2d 649, 659 (1996). Further, "[t]he ultimate determination of whether . . . statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate question[] of statutory . . . immunity [is] ripe for summary disposition." *Id.* at 144, 479 S.E.2d at 654, syl. pt. 1.[6] But, where "the information contained in the pleadings is sufficient to justify the case proceeding further, the early motion to dismiss should be denied." *Id.* at 150, 479 S.E.2d at 660.

With these standards to guide us, we now consider the issues raised in this appeal.

---

[6] "The very heart of the immunity defense is that it spares the defendant from having to go forward with an inquiry into the merits of the case." *Hutchison*, 198 W. Va. at 148, 479 S.E.2d at 658. Thus, "claims of immunities, where ripe for disposition, should be summarily decided before trial." *Id.* at 147, 479 S.E.2d at 657.

### III. Discussion

#### A.

Coronavirus Disease 2019 (COVID-19) is a viral illness caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).[7] It is a highly contagious and potentially deadly illness.[8] On March 13, 2020, the President of the United States issued a "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," and determined that the emergency began on March 1, 2020.[9] Following suit, the Governor of West Virginia "proclaimed a State of Emergency

---

[7] *See* https://www.ncbi.nlm.nih.gov/books/NBK554776/. We note that "'Rule 12(b)(6) permits courts to consider matters that are susceptible to judicial notice.'" *Forshey v. Jackson*, 222 W. Va. 743, 752, 671 S.E.2d 748, 752 (2008) (quoting Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 12(b)(6)[2], at 348 (3d ed. 2008)). This Court may, on its own, judicially notice adjudicative facts "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." W. Va. R. Evid. 201(b)(1) and (2). *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (Citing Federal Rule of Evidence 201(b) and stating that "[t]his court and numerous others routinely take judicial notice of information contained on state and federal government websites"); *see also Nguyen v. Stephens Institute*, 529 F.Supp.3d 1047, 1053 (N.D. Cal. 2021) ("Generally, a court may take judicial notice of government publications."). The National Institutes of Health (NIH) is a part of the United States Department of Health and Human Services, and so its publications are matters of public record and proper subjects of judicial notice.

[8] *See State ex rel. Porter v. Farrell*, 245 W. Va. 272, 282 n.15, 858 S.E.2d 897, 907 n.15 (2021) (citation omitted) (recognizing that COVID-19 is the "'highly contagious and potentially deadly illness caused by the novel coronavirus'").

[9] *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* White House (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

15

on March 16, 2020, finding that the COVID-19 pandemic constitutes a disaster under § 15-5-2 of this code." W. Va. Code § 55-19-2(a)(3). Certain actions were subsequently taken "[t]o protect public health, safety, and welfare," including directing "all nonessential businesses . . . to cease all activities except for minimum basic operations in the state[,]" W. Va. Code § 55-19-2(a)(4), and directing "all West Virginia residents . . . to stay at home unless performing an essential activity." W. Va. Code § 55-19-2(a)(5).

Our Legislature subsequently enacted the COVID-19 Jobs Protection Act,[10] finding that

> (9) West Virginia is reopening its businesses, including restaurants, retail stores, office buildings, fitness centers, hotels, hair and nail salons, and barber shops, as well as religious institutions.
>
> (10) Lawsuits are being filed across the country against health care providers and health care facilities associated with care provided during the COVID-19 pandemic and illness of health care workers due to exposure to COVID-19 while providing essential medical care, and against businesses seeking damages associated with a person's exposure to COVID-19.
>
> (11) The threat of liability poses an obstacle to efforts to reopen and rebuild the West Virginia economy and to continue to provide medical care to impacted West Virginians.

---

[10] The COVID-19 Jobs Protection Act became effective March 11, 2021, is "effective retroactively from January 1, 2020, and applies to any cause of action accruing on or after that date." W. Va. Code § 55-19-9(a).

16

(12) The diagnosis and treatment of COVID-19 has rapidly evolved from largely unchartered, experimental, and anecdotal observations and interventions, without the opportunity for the medical community to develop definitive evidence-based medical guidelines, making it difficult, if not impossible, to identify and establish applicable standards of care by which the acts or omissions of health care providers can fairly and objectively be measured.

W. Va. Code § 55-19-2(a)(9) through (12). The stated purpose of the Act is to:

(1) Eliminate the liability of the citizens of West Virginia and all persons including individuals, health care providers, health care facilities, institutions of higher education, businesses, manufacturers, and all persons whomsoever, and to preclude all suits and claims against any persons for loss, damages, personal injuries, or death arising from COVID-19.[11]

---

[11] For purposes of the Act, and relevant here, the term "arising from COVID-19" means

any act from which loss, damage, physical injury, or death is caused by a natural, direct, and uninterrupted consequence of the actual, alleged, or possible exposure to, or contraction of, COVID-19, including services, treatment, or other actions in response to COVID-19, and without which such loss, damage, physical injury, or death would not have occurred, including, but not limited to:

(A) Implementing policies and procedures designed to prevent or minimize the spread of COVID-19;
(B) Testing;
(C) Monitoring, collecting, reporting, tracking, tracing, disclosing, or investigating COVID-19 exposure or other COVID-19-related information;
(D) Using, designing, manufacturing, providing, donating, or servicing precautionary, diagnostic, collection, or other

Continued . . .

17

> (2) Provide assurances to businesses that reopening will not expose them to liability for a person's exposure to COVID-19.

W. Va. Code § 55-19-2(b). To effectuate the Act's purpose, the Legislature provided for broad immunity from liability to, *inter alia*, health care facilities and health care providers[12] for injury or death arising from COVID-19 or "COVID-19 care."[13] West Virginia Code § 55-19-4 provides:

> Notwithstanding any law to the contrary, except as provided by this article, there is no claim against any person, essential business, business, entity, health care facility, health care provider, first responder, or volunteer for loss, damage, physical injury, or death arising from COVID-19, from COVID-19 care, or from impacted care.

> Though the immunity afforded under the Act is, by any measure, broad in

scope because it provides that "there is no claim . . . for loss, damage, physical injury, or

---

> health equipment or supplies, such as personal protective equipment;
> (E) Closing or partially closing to prevent or minimize the spread of COVID-19[.]

W. Va. Code § 55-19-3(1)(A) through (E).

[12] It is undisputed that petitioners fall within the definition of "health care facility" and "health care provider" under the Act.

[13] "'COVID-19 Care' means services provided by a health care facility or health care provider, regardless of location and whether or not those services were provided in-person or through telehealth or telemedicine, that relate to the testing for, diagnosis, prevention, or treatment of COVID-19, or the assessment, treatment, or care of an individual with a confirmed or suspected case of COVID-19." W. Va. Code § 55-19-3(3).

death arising from COVID-19[,]" *id.*, the limitations on liability are not absolute. Rather, the Act specifically excepts from its provision of immunity certain actions statutorily described as "intentional conduct with actual malice." Specifically, West Virginia Code § 15-19-7 provides:

> Excluding the provisions of § 55-19-5[14] and § 55-19-6[15] of this code, the limitations on liability provided in this article shall not apply to any person, or employee or agent thereof, who engaged in intentional conduct with actual malice.

W. Va. Code § 55-19-7 (footnotes added).

At issue in this appeal is whether the circuit court correctly defined "actual malice" in the context of the Act as "requir[ing] proof that the defendant acted with the intent to injure or harm the plaintiff and/or decedent," and (2) whether the factual allegations of the complaint are "sufficient to justify the case proceeding further" such that

---

[14] West Virginia Code § 55-19-5(a) and (b) limits liability on claims alleged to have been caused by, or resulting from, the use of certain products made, sold, and donated in response to COVID-19 except where "any person, or any employee or agent thereof"

> (1) Had actual knowledge of a defect in the product when put to the use for which the product was manufactured, sold, distributed, or donated; and acted with conscious, reckless, and outrageous indifference to a substantial and unnecessary risk that the product would cause serious injury to others; or
>
> (2) Acted with actual malice.

W. Va. Code § 55-19-5(c).

[15] West Virginia Code § 55-19-6 concerns the filing of workers' compensation claims resulting from work-related injury, disease, or death caused by or arising from COVID-19 in the course of and resulting from covered employment.

19

the motions to dismiss were properly denied. *Hutchison*, 198 W. Va. at 150, 479 S.E.2d at 660.

In its order denying respondents' motions to dismiss, the circuit court observed that the term "actual malice" is not defined in the Act, and so it resorted to the definition of "actual malice" as that term was defined in *Hayseeds*. *Hayseeds* involved policyholders who sued their insurance company for refusing to pay their property damage claim, and, in seeking an award of punitive damages, alleged that the company "failed to make a fair, good faith investigation of the facts and circumstances surrounding the fire [that burned down their building]" and that it, instead, "focused only upon circumstances that could justify the denial of the claim." *Hayseeds*, 177 W. Va. at 326, 352 S.E.2d at 76. Ultimately, this Court held that "[a]n insurer cannot be held liable for punitive damages by its refusal to pay on an insured's property damage claim unless such refusal is accompanied by a malicious intention to injure or defraud." *Id.* at 324, 352 S.E.2d at 74, Syl. Pt. 2. In concluding that the insurance company's "preconceived disposition to deny the claim . . . did not rise to the level of malice" necessary for an award of punitive damages, *id.* at 331, 352 S.E.2d at 81, we explained that a policyholder may not recover punitive damages where a property damage claim is denied unless the policyholder

> can establish a high threshold of actual malice in the settlement process. By "actual malice" we mean that the company actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally denied the claim. We intend this to be a bright line standard, highly susceptible to summary judgment for the defendant, such as exists in the law of libel and slander, or the West Virginia law of commercial arbitration. *See, e.g., N.Y. Times v. Sullivan*, 376 U.S. 254, 84

20

S.Ct. 710, 11 L.Ed. 686 (1964) and *Board of Education v. Miller*, 160 W. Va. 473, 236 S.E.2d 439 (1979). Unless the policyholder is able to introduce evidence of intentional injury – not negligence, lack of judgment, incompetence, or bureaucratic confusion – the issue of punitive damages should not be submitted to the jury.

*Hayseeds*, 177 W. Va. at 330-31, 352 S.E.2d at 80-81 (footnote omitted). From the foregoing, the circuit court in this case concluded that, within the context of the Act, "'actual malice' requires proof that the defendant acted with the intent to injure or harm the plaintiff and/or decedent."[16] We generally agree with the circuit court insofar as it concluded that, within the context of the Act, the term "actual malice" means that a defendant must have acted with an intent to injure; however, the additional requirement that the circuit court imposed requiring proof that the defendant must have acted with an intent to injure the plaintiffs and/or their decedent was in error, as it is not supported by the plain language of the statute.

Before turning to our analysis of West Virginia Code § 55-19-7 and, specifically, the meaning of "actual malice" as that term is employed in the statute, we briefly review our rules of statutory construction. "The primary object in construing a

---

[16] In their opening brief to this Court, petitioners argued that, under the circuit court's definition of "actual malice," respondents are required to prove that petitioners intended to harm or *kill* respondents and/or Mr. Fields. In response, respondents argued that such an interpretation of the circuit court's ruling would violate the Certain Remedies and Due Process Clauses of the West Virginia Constitution. We note that petitioners abandoned this argument in their reply brief and at oral argument. Instead, they now argue that the circuit court correctly defined "actual malice" as requiring "proof that the defendant acted with the intent to injure or harm the plaintiff and/or decedent[.]" Therefore, we need not address respondents' argument that West Virginia Code § 55-19-7 is unconstitutional.

21

statute is to ascertain and give effect to the intent of the Legislature." Syl. Pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). If the legislative intent is clearly expressed in the statute, then this Court is not permitted to construe the statutory provision but, rather, is obliged to apply its plain language. To that end, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power*, 195 W. Va. at 587, 466 S.E.2d at 438. Thus, "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951). *See also DeVane v. Kennedy*, 205 W. Va. 519, 529, 519 S.E.2d 622, 632 (1999) ("Where the language of a statutory provision is plain, its terms should be applied as written and not construed."). Conversely, "[a] statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *Sizemore v. State Farm Gen. Ins. Co.*, 202 W. Va. 591, 596, 505 S.E.2d 654, 659 (1998) (internal quotations and citation omitted).

In this case, by providing that "the limitations on liability provided in [the Act] shall not apply to any person, or employee or agent thereof, who engaged in intentional conduct with actual malice[,]" W. Va. Code § 55-19-7, the Legislature intended to create an exception to the broad provision of immunity otherwise afforded by the Act for claims for loss, injury, or death arising from COVID-19 or COVID-19 care. *See* W. Va.

22

Code § 55-19-4.[17] In discerning the meaning of this statutory exception – in particular, the meaning of the term "actual malice" as it is used in this provision – we observe, as did the court below, that the Legislature elected not to define that term for purposes of the Act. That the term "actual malice" is not defined in the statute does not, however, render it ambiguous. Indeed, we have previously encountered similar "instances . . . where the language used by the Legislature may be plain but where it has failed to define a certain word or phrase." *State v. Sulick*, 232 W. Va. 717, 724, 753 S.E.2d 875, 882 (2012). In that event, "[u]ndefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning." Syl. Pt. 6, in part, *State ex rel. Cohen v. Manchin*, 175 W. Va. 525, 336 S.E.2d 171 (1984). *See also State v. Soustek*, 233 W. Va. 422, 426, 758 S.E.2d 775, 779 (2014) ("In determining what undefined words and terms in a statute mean, undefined words and terms are given their common, ordinary and accepted meaning." (Quotations and citation omitted)). "[A]ctual malice" is defined as "[t]he deliberate intent to commit an injury, as evidenced by external circumstances." *Black's Law Dictionary* 1146 (11th ed. 2019).[18] It is particularly significant that "actual malice" is

---

[17] In addition to health care facilities and health care providers, West Virginia Code § 55-19-4 eliminates claims against "any person, essential business, entity, . . . first responder, or volunteer for loss, damage, physical injury, or death arising from COVID-19, from COVID-19 care, or from impacted care." *Id.*

[18] This Court has routinely looked to dictionary definitions to afford undefined terms their common, ordinary, and accepted meaning. *See e.g., State v. McClain*, 247 W. Va. 423, 880 S.E.2d 889 (2022) (the terms "crash" and "involved" as used in our "hit-and-run statute," West Virginia Code § 17C-4-1); *King v. West Virginia's Choice, Inc.*, 234 W. Va. 440, 766 S.E.2d 387 (2014) (the phrase "subject to" as used in West Virginia Code § 21-5C-1(e) of the Minimum Wage and Maximum Hours Standards statute); *State v. Soustek*,

Continued . . .

*not* defined as the deliberate intent to injure a particular person. And, even more critically, when we consider the precise language employed in West Virginia Code § 55-19-7 itself, the statute similarly does not provide that, for this exception to apply, the defendant must have engaged in intentional conduct with actual malice *toward the plaintiff* (or, as the circuit court found, the plaintiff's decedent). We have often stated that "[i]t is not for this Court arbitrarily to read into a statute that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the Legislature purposely omitted." Syl. Pt. 11, *Brooke B. v. Ray C.*, 230 W. Va. 355, 738 S.E.2d 21 (2013). Stated another way, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Appalachian Power Co.*, 195 W. Va. at 586, 466 S.E.2d at 437 (internal citation omitted). Had the Legislature intended that for West Virginia Code § 55-19-7 to apply, a plaintiff must prove that the defendant engaged in intentional conduct with actual malice toward the plaintiff, it would have explicitly so provided. [19] *See State v. J.E.*, 238

---

233 W. Va. 422, 758 S.E.2d 775 (2014) (the terms "financial" and "transaction" as used in the identify theft statute, West Virginia Code § 61-3-54); *State v. Sulick*, 232 W. Va. 717, 753 S.E.2d 875 (2012) (the phrase "threat of force" as used in the criminal civil rights statute, West Virginia Code § 61-6-21(b) (1987)); *CSX Hotels, Inc. v. City of White Sulphur Springs*, 217 W. Va. 238, 617 S.E.2d 785 (2005) (the term "survey" as used in the annexation procedure set forth in West Virginia Code § 8-6-2(a)); *In re Clifford K.*, 217 W. Va. 625, 619 S.E.2d 138 (2005) (the term "recognized" as used in the statutory definition of "legal parent," West Virginia Code § 48-1-232).

[19] By comparison, the Legislature explicitly so provided, for purposes of proving an entitlement to punitive damages:

Continued . . .

W. Va. 543, 549, 796 S.E.2d 880, 886 (2017) ("'We look to the plain meaning of the statutory language, and presume that the legislature chose, with care, the words it used when it enacted the relevant statute.'" (quoting *Fox v. Fox*, 734 S.E.2d 662, 667 (Va. Ct. App. 2012))). Accordingly, we hold that West Virginia Code § 55-19-7 (2021) of the COVID-19 Jobs Protection Act provides that the limitations on liability specified in the Act "shall not apply to any person, or employee or agent thereof, who engaged in intentional conduct with actual malice."[20] Proof of actual malice requires evidence that the

---

> An award of punitive damages may only occur in a civil action against a defendant if a plaintiff establishes by clear and convincing evidence that the damages suffered were the result of the conduct that was carried out by the defendant with *actual malice toward the plaintiff* or a conscious, reckless and outrageous indifference to the health, safety and welfare of others.

W.Va. Code § 55-7-29(a) (2015) (emphasis added).

[20] We acknowledge that, in West Virginia Code § 55-19-7, the Legislature employed the phrase "intentional conduct with actual malice" and that the parties and circuit court primarily focused their efforts on the meaning of the latter term, "actual malice," without much consideration of the former, "intentional conduct." Indeed, only respondents attributed any meaning to the term – that "intent" "denotes that 'the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" *Funeral Servs. by Gregory, Inc. v. Bluefield Cmty. Hosp.*, 186 W. Va. 424, 427, 413 S.E.2d 79, 82 (1991) (quoting Restatement (Second) of Torts, § 8A (1965)), *overruled on other grounds, Courtney v. Courtney*, 190 W. Va. 126, 437 S.E.2d 436 (1993); *see also Mandolidis v. Elkins Indus., Inc.*, 161 W. Va. 695, 706 n.9, 246 S.E.2d 907, 914 n.9 (1978) (adopting Restatement definition of "intent")), *superseded by statute as stated in Messer v. Huntington Anesthesia Group, Inc.*, 218 W. Va. 4, 620 S.E.2d 144 (2005). Common sense dictates that, given our holding that, in the context of West Virginia Code § 55-19-7, "actual malice" means "the deliberate intent to commit an injury, as evidenced by external circumstances," one cannot act with "actual malice" without also engaging in "intentional conduct." Thus, we need "not give independent meaning to a

Continued . . .

person, or employee or agent acted with the deliberate intent to commit an injury, as evidenced by external circumstances.

Finally, we emphasize that by purposefully creating this decidedly narrow exception to the immunity from liability otherwise afforded under the Act, the Legislature was equally as purposeful in not excepting conduct engaged in with "conscious, reckless, and outrageous indifference," as it did elsewhere in the Act. *Compare* W. Va. Code § 55-19-5(c) (limiting liability on claims relating to the use of certain products made, sold, and donated in response to COVID-19 except where the defendant either "(1) [h]ad actual knowledge of a defect in the product . . . and *acted with conscious, reckless, and outrageous indifference* to a substantial and unnecessary risk that the product would cause serious injury to others; *or* (2) *[a]cted with actual malice*" (emphasis added)). Thus, it is clear that, for purposes of West Virginia Code § 55-19-7, the definition of "actual malice" does not encompass conduct engaged in with "conscious, reckless, and outrageous indifference." [21]

---

[term] where it is apparent from the context of the act that the [term] is surplusage[.]'" *State ex rel. Prosecuting Atty of Kanawha Cnty v. Bayer Corp.*, 223 W. Va. 146, 157 n.22, 672 S.E.2d 282, 293 n.22 (2008) (quoting *National Mining Ass'n v. Kempthorne*, 512 F.3d 702, 706 (D.C. Cir. 2008)).

[21] We also note that whether a defendant has acted with the deliberate intent to commit an injury for purposes of determining whether the defendant is entitled to immunity from liability under the COVID-19 Jobs Protection Act is separate and distinct from determining whether a defendant may lose the benefit of immunity under our workers' compensation law where "the employer or person against whom liability is asserted acted with 'deliberate intention.'" W. Va. Code § 23-4-2(d)(2). *See Edwards v. Stark*, 247 W. Va. 415, 420, 880 S.E.2d 881, 886 (2022) ("The workers' compensation statute allows for two types of deliberate intent claims: (1) heightened deliberate intent claims under West Virginia Code § 23-4-2(d)(2)(A), and (2) five-factor deliberate intent claims under § 23-4-2(d)(2)(B)(i)-(v).").

B.

We now turn to evaluating whether the complaint's factual allegations, including all inferences arising therefrom, are "sufficient to justify the case [against each petitioner] proceeding further" such that the motions to dismiss were properly denied. *Hutchison*, 198 W. Va. at 150, 479 S.E.2d at 660. We find that the complaint satisfies the heightened pleading requirement traditionally applied in immunity cases, *see id.* at 149, 479 S.E.2d at 659, and includes sufficient factual allegations that Eldercare engaged in intentional conduct with actual malice to justify the case against it proceeding further – that is, for purposes of application of West Virginia Code § 55-19-7 to the limitations on liability otherwise afforded by the COVID-19 Jobs Protection Act, Eldercare acted with a deliberate intent to commit an injury, as evidenced by the external circumstances set forth in the complaint. However, as to Jackson General Hospital and Dr. Snyder, the complaint fails to allege sufficient facts, even when viewed in the light most favorable to respondents, that these petitioners engaged in intentional conduct with actual malice such that West Virginia Code § 55-19-7 applies.

1. *Eldercare*

According to the factual allegations of the complaint, Eldercare has a history of inadequately managing infectious disease at its facility and of frequently being understaffed. Not long before the COVID-19 pandemic began, it reportedly failed to report an outbreak of an unknown respiratory illness occurring at its facility and was cited

27

seventeen times for health violations, which amounted to "five more violations than the average number of citations for West Virginia nursing homes and 8.8 more than the U.S. average." Eldercare did not report the outbreak to authorities until after inspectors arrived for a surprise inspection. Despite this history, and that Eldercare was "on high-alert for COVID-19" since at least February 2020, once employees and residents began showing symptoms and, in some cases, testing positive for COVID-19, Eldercare's conduct, the complaint alleges, became problematic. To the public, health officials, and residents' families, Eldercare promised that it had "stringent health protocols" in place and that it was following them. Eldercare represented that its "top priority" was the safety of its residents, that residents who tested positive for COVID-19 "were quarantined within the facility as per CDC guidelines," and that employees who were ill or awaiting COVID-19 test results were not permitted to work. Eldercare advised its employees that it would notify them of any positive cases "for the protection of residents and staff." The reality, however, was alleged to be quite different – that is, that Eldercare intentionally downplayed the outbreak at its facility, refused to test residents even when family members requested it, misrepresented how many residents and staff were COVID positive or suspected COVID positive, and, at times, falsely represented that none of its staff had tested positive for COVID-19. The situation at Eldercare was so dire that the governor deployed the West Virginia National Guard to the facility to test both residents and staff.

When residents began running fevers, coughing, or exhibiting breathing problems, Eldercare management appear to have intentionally misled employees, telling them that the symptoms were "just the flu and not COVID." The complaint alleges that it

28

was Eldercare's policy that employees who were exposed to COVID-19 were not to quarantine and were expected to work. Residents continued to eat together in the dining hall and gather in the facility's common area. While Eldercare distributed masks to some employees, residents (including ill residents) often did not wear masks. The complaint alleges that even though there were only eighty-six residents living at Eldercare's 120-bed facility, sick residents remained in their rooms with residents who were not sick, and only when the sick resident developed severe symptoms did Eldercare move the other resident who was not showing symptoms out of the room. The other resident would then be moved to another room with another resident "where the same thing would happen" all over again. Eldercare did not test sick residents for COVID-19 even when they had COVID symptoms because, the complaint alleges, Eldercare "did not want to know [the residents] were [COVID] positive."

The complaint also alleges that Eldercare staff who cared for COVID-positive residents in one room were directed to "go into the next room to care for [residents] who were not COVID positive." When the family of an Eldercare resident requested that the resident be tested for COVID-19 because the resident had been symptomatic for weeks, Eldercare refused, and the resident died on April 18, 2020. Also in April 2020, Eldercare refused to test another resident even though the resident's wife "begged" that he be tested because he had been experiencing symptoms for more than two weeks. Eldercare "kept telling [the resident's wife] the resident was fine" but the resident later died of COVID-19.

The complaint further alleges that Eldercare deliberately did not inform, or intentionally misinformed, its staff about the COVID-status of residents they were closely

29

caring for, and then terminated the employment of staff who sought to protect residents by quarantining themselves after being exposed to COVID-19 at the facility. In one instance, after an Eldercare employee cared for an obviously sick resident for seven hours, she was advised that the resident had tested positive for COVID-19. Eldercare already knew or suspected that the resident had COVID-19 but "intentionally never told the employee" until after the employee was already exposed. Although the employee assumed that she would need to quarantine after being exposed to COVID-19, she was told not to quarantine, and when the employee sought to avoid contact with residents, she was told by administrator Kimball that he was "accepting [the employee's] resignation." The employee contracted COVID-19 from her exposure to COVID-positive residents at Eldercare. In another instance, an employee learned that an unidentified resident had tested positive for COVID-19. When the employee asked administrator Kimball directly if the ill resident that she had been closely caring for for two days was the unidentified resident who had tested positive, Kimball falsely advised the employee that she was "nowhere around" the COVID-positive resident. However, the next day, the employee learned that the ill resident she had been closely caring for (including brushing the resident's teeth multiple times per day) "was, in fact, positive for COVID[.]" Eldercare made no efforts toward ensuring that the employee test for COVID-19. The employee assumed that she would need to quarantine and so advised Eldercare; however, the employee was terminated from her employment because "she did not show up [to work] for two days." A third employee was alleged to have been terminated after administrator Kimball became angered by an anonymous report of the facility's COVID outbreak to the local health department that Kimball believed the

30

employee had made. According to the complaint, "[T]he last thing [Kimball said he] wanted was the media to get ahold of this place."

Moreover, the complaint alleges that Eldercare intentionally misrepresented to Respondent Lambert that, on or about April 9, 2020, the facility had "only one positive case" of COVID-19, and that that COVID-positive resident was "in lockdown" and "was isolated in a different area from" respondents' parents. Eldercare told Respondent Lambert that her parents "were fine and had no symptoms" and, when she "asked whether she should take [her parents] home[,]" she was specifically told that "they were safer at Eldercare." Based upon Eldercare's misrepresentations, the complaint alleges, Respondent Lambert decided to leave her father at Eldercare. When she eventually decided to remove him from the facility (a decision that "Eldercare personnel tried to talk her out of"), he was "in terrible shape," with "multiple bruises," and "smell[ing] of urine." Eldercare said that Mr. Fields "just had a UTI," but "he was so sick he had to be carried into the house." Within twenty-four hours, Mr. Fields was taken by ambulance to the emergency room at Jackson General where he was diagnosed with "a head injury with hemorrhage from a fall at Eldercare" and COVID-19. Despite the fact that Eldercare specifically told Respondent Lambert that her father had not been exposed to COVID-19, hospital records indicated that, in fact, he had been exposed to COVID-19 at Eldercare. Mr. Fields died a few days later. His "immediate cause of death was listed as COVID-19," with the discharge summary also indicating his cause of death as "multifactorial secondary to complications of aging and dementia exacerbated by acute COVID positive state, UTI with E. coli, and cerebral hemorrhage." Respondents' mother died the previous day and was also positive for COVID-19. In all,

31

fifteen residents at Eldercare died, while seventy-one of its eighty-six residents became infected with COVID-19. Thirty-two Eldercare staff also tested positive for COVID-19.

Respondent's complaint is both detailed and comprehensive. It includes allegations that as a result of Eldercare's alleged conduct, respondents did not remove their father from its facility but, instead, permitted him to remain there "in imminent danger as the COVID-19 virus spread unchecked throughout the Eldercare facility[,]" and that Eldercare "withheld necessary care from Mr. Fields so as to cause his death."

At this stage of the proceedings, construing the allegations of the complaint against Eldercare, including all inferences arising therefrom, in the light most favorable to respondents, we cannot say that respondents can prove no set of facts such that West Virginia Code § 55-19-7 would not apply to negate the limitations on liability otherwise afforded under the COVID-19 Jobs Protection Act. Accordingly, the circuit court's denial of Eldercare's motion to dismiss was not error.

## 2. *Jackson General and Dr. Snyder*

As to the allegations relating to Dr. Snyder and Jackson General's subsequent treatment and care of Mr. Fields, we reach the opposite conclusion.[22] Regarding Mr. Fields's COVID-19 diagnosis, the allegations against petitioners Jackson General and Dr. Snyder include that these petitioners failed to order a "work up for hypoxemia," "repeat x rays," or to "meaningfully discuss[] [Mr. Fields'] COVID positive status," and that they

---

[22] Although the complaint generally alleges that Dr. Snyder provided healthcare services at and for Eldercare, it does not otherwise recount any conduct undertaken by him in connection with those services.

32

erred when they determined that Mr. Fields was "clinically stable and [that] his UTI could be treated with over-the-counter antibiotics." These factual allegations simply do not rise to the level of conduct engaged in with "actual malice" within the meaning of West Virginia Code § 55-19-7. We, therefore, conclude that the circuit court erred in denying Dr. Snyder and Jackson General's motion to dismiss.

## IV. Conclusion

Based upon all of the foregoing, we affirm the circuit court's order insofar as it denied the motion to dismiss filed by Eldercare; however, we reverse the order denying the motion to dismiss filed by Jackson General Hospital and Dr. Snyder. The case is, accordingly, remanded for further proceedings.

Affirmed, in part; reversed, in part; and remanded.